**SHAMROCK HOLDINGS, INC.,** Indiana Partners, L.P., Oregon Partners, Shamrock Capital, L.P. and Shamrock Holdings of California, Inc., Plaintiffs,

v.

**POLAROID CORPORATION,** I. MacAllister Booth, Yen–Tsai Geng, Richard D. Hill, Frank S. Jones, Carl Kaysen, William J. McCune, Jr., Henry Necarsulmer, Kenneth H. Olson, Julius Silver, Charles P. Slichter, Ralph Z. Sorenson, A. Michael Spence and Alfred M. Zeien, Defendants.

**In re POLAROID SHAREHOLDERS LITIGATION.**

Civ. A. Nos. 10075, 10079.

Court of Chancery of Delaware, New Castle County.

Submitted: Dec. 16, 1988.

Decided: Jan. 6, 1989.

A. Gilchrist Sparks, Lawrence A. Hamermesh, Kenneth J. Nachbar, Robert J. Valihura, Jr. and Alan J. Stone of Morris, Nichols, Arsht & Tunnell, Wilmington, and Michael H. Rauch, Debra M. Torres, William C. Viets, John C. Sullivan, and Douglas H. Flaum of Fried, Frank, Harris, Shriver & Jacobson, New York City, for plaintiffs, Shamrock Holdings, Inc., Indiana Partners, L.P., Oregon Partners, Shamrock Capital, L.P. and Shamrock Holdings of California, Inc.

Joseph A. Rosenthal of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, Jill S. Abrams of Abby & Ellis, Michael P. Fuchs of Wolf Popper Ross Wolf & Jones, and Ronald Litowitz of Bernstein Litowitz Berger & Grossman, New York City, and Curtis V. Trinko, New York City, for Shareholder Litigation plaintiffs.

R. Franklin Balotti, Jesse A. Finkelstein, Gregory V. Varallo, James C. Strum, and Daniel A. Dreisbach of Richards, Layton & Finger, Wilmington, Frederick A.O. Schwarz, Jr., Robert N. Feltoon, and Timothy C. Harrison, of Cravath, Swaine & Moore, New York City, and Stephen D. Poss of Goodwin, Procter & Hoar, Boston, Mass., for defendants.

## OPINION

BERGER, Vice–Chancellor.

This case involves an attack upon the validity of an employee stock ownership plan adopted by Polaroid Corporation ("Polaroid") on July 12, 1988. Unlike most litigation precipitated by an attempted takeover, this case proceeded to trial while the tender offer was outstanding and the Court is rendering its final decision on the merits.

Plaintiffs, Shamrock Holdings, Inc. and its affiliates (collectively "Shamrock") filed Civil Action No. 10,075 on July 20, 1988 alleging that: (1) Polaroid's directors breached their fiduciary duties in adopting the Polaroid Stock Equity Plan (the "ESOP"); and (2) defendants breached certain promises to Shamrock in connection with a meeting scheduled to take place on July 13, 1988 with the result that Shamrock suffered substantial monetary damages. Several Polaroid stockholders thereafter filed purported class actions attacking the ESOP and those actions were later consolidated under Civil Action No. 10,079. The stockholder plaintiffs assert the same breaches of fiduciary duty in connection with the adoption of the ESOP as are alleged by Shamrock. In addition, they claim that the defendant directors breached their fiduciary duty of candor by failing to disclose material facts and that they wrongfully appropriated material non-public information by setting the price for the ESOP shares without disclosing Shamrock's interest in Polaroid.

The trial of the two actions, which were not consolidated, lasted for thirteen days and concluded on November 16, 1988. Post trial briefing was completed on December 12, 1988 and the claims were presented to the Court for decision following oral argument on December 16, 1988.

## I.

The following is a summary of the relevant facts drawn from more than 3,000 pages of trial transcripts, more than 500 exhibits and extensive excerpts from the depositions of 34 witnesses.

### A. *The Parties*

Shamrock Holdings, Inc. and its affiliates (collectively "Shamrock") are corporations or partnerships owned and controlled by Roy E. Disney ("Disney") and members of his family. Stanley Gold ("Gold"), formerly a practicing attorney, is the President and Chief Executive Officer of Shamrock Holdings, Inc. Through its subsidiaries, Shamrock Holdings, Inc. is engaged primarily in the businesses of television and radio broadcasting, retail home entertainment software, real estate development and the making of investments. Shamrock does not have a history of making hostile acquisitions, although it has profited from its significant investments in several companies over the past few years.

On September 9, 1988 an affiliate of Shamrock Holdings, Inc. commenced a $42 per share cash tender offer for all of Polaroid's outstanding common stock. The offer has been extended repeatedly, in part because, as amended, the offer is conditioned upon a final judicial determination invalidating or rescinding the ESOP shares. According to its original Offer to Purchase, if the ESOP shares are not invalidated or rescinded, Shamrock intends to amend the offer by reducing the price to $40 per share, among other things. The offer is currently scheduled to expire on January 6, 1989, although Shamrock has indicated its intention to extend the offer from time to time at least until there is a final judicial determination with respect to the ESOP.

Polaroid is a Delaware corporation with its principal place of business in Cambridge, Massachusetts. Prior to the formation of the ESOP, it had approximately 62 million shares of common stock outstand-

ing, which shares have traded at prices ranging from $16.75 to $44.125 during the past three years. The thirteen members of the board of directors, all of whom have been named as defendants, are Yen–Tsai Feng, Richard D. Hill, Frank S. Jones ("Jones"), Carl Kaysen ("Kaysen"), Henry Necarsulmer, Kenneth H. Olsen, Julius Silver ("Silver"), Charles P. Slichter, Ralph Z. Sorenson ("Sorenson"), A. Michael Spence ("Spence"), Alfred M. Zeien, Isràel MacAllister Booth ("Booth"), and William J. McCune, Jr ("McCune"). Only three members of the board are also officers of Polaroid—Booth, who is President and Chief Executive Officer; McCune, who is a past President and Chief Executive Officer and currently serves as Chairman of the Board; and Silver, who is a Vice President and member of the Management Executive Committee ("MEC").

The directors, collectively, have impressive credentials in the fields of business, science, education and government. For example, Jones is a professor at the Massachusetts Institute of Technology ("MIT") and is a former dean of the Harvard Business School. Kaysen, also a professor at MIT, was the director of the Institute of Advanced Study in Princeton and was a special assistant to President Kennedy for national security affairs. Sorenson served as president of a Massachusetts college and is now the Chairman and Chief Executive Officer of Barry Wright Corporation, a diversified manufacturing company. Spence is a professor of economics and business administration at Harvard University and Dean of the Faculty of Arts and Sciences at Harvard College.

B. *Polaroid's Business, Vulnerability and Defenses.*

Polaroid is in the business of developing, manufacturing and marketing a variety of products, primarily those related to instant image recording. These include its well known instant cameras and films as well as light polarizing filters and lenses and various chemical, optical and commercial products used in photography, industry, science, medicine and education. Since the time Polaroid was founded in 1937 by Dr. Edwin Land, technological innovations and the development of commercial applications for those innovations have been the key to its success. Polaroid introduced the first instant camera in 1948 and advances in the instant imaging field over the next 25 years played a significant part in Polaroid's rapid growth and high profitability. However, by the 1980's, Polaroid was no longer enjoying the same level of growth and profitability it had experienced in prior years. This decline in profitability was attributed, in part, to increased competition from inexpensive 35 millimeter cameras and the availability of rapid developing for conventional film.

Because of the nature of its business, Polaroid has always devoted a significant portion of its resources to research and development. Although the technological advances generated by this work sometimes lead to successful commercial products, that is not always the case. In addition, it may take years of research and development before a new product is introduced and begins generating income. In short, research and development cuts into Polaroid's short term profits but provides the basis for anticipated long term growth.

Another important aspect of Polaroid's culture, according to defendants, is its emphasis on employee involvement in the success of the company. In its early years, when Polaroid was a small company, Dr. Land promoted a "family" atmosphere by maintaining open and informal lines of communication between workers and management and by encouraging employees to share in management's goals for growth and profitability. For example, Dr. Land held annual meetings with the employees to discuss the company's performance and future plans. He also created an Employees' Committee (the "EC") shortly after World War II to represent employees in connection with grievances or other work related problems and to assist in the preparation and evaluation of policies affecting employees. As the company grew, other efforts were made to maintain a high level of employee identification with the company. A profit sharing program for all

employees was instituted in 1969 and, in the 1970's, Polaroid created a very small employee stock ownership plan under the TRASOP and PAYSOP statutes then in effect.

For the past few years, financial analysts and members of management have recognized Polaroid's potential as a takeover target. Several factors contributed to the company's vulnerability: (1) profits have been down; (2) Polaroid carries a relatively small amount of debt; and (3) Polaroid has a potentially enormous, as yet unliquidated asset—damages from Kodak for patent infringement (Polaroid is seeking more than $6 billion). The company has taken steps to protect itself against the threat of a takeover. In 1986 the board adopted a stockholder rights plan containing "flip-in" and "flip-over" provisions. In addition, the board is authorized to issue "blank check" preferred stock, stockholders are not permitted to take action by consent and they are not permitted to call special meetings.

### C. Events Leading to March 29, 1988 Approval of ESOP.

In 1985, a few years after Booth became President, he and McCune, then Chairman of the Board and Chief Executive Officer, began what has been called the "change process" in an effort to improve Polaroid's operations and financial strength. Task forces, which included both management and employee representatives, were set up to review such matters as job redesign, compensation, job security and "movement of people" (how employees are promoted and transferred to make the most efficient use of the work force). Although it was contemplated that the task forces would complete their work in a matter of months, the change process dragged on for years.

At about the same time that the change process got underway, McCune spoke with E. R. Bedrosian ("Bedrosian"), then the Treasurer of Polaroid, about the use of an employee stock ownership plan as a form of incentive to improve employee performance. McCune had been in favor of such a plan for many years and Bedrosian was asked to study the idea and present a proposal. In September, 1985, Bedrosian presented his report to McCune, Booth and John Harlor ("Harlor"), then Vice President of Corporate Personnel. The proposal called for the allocation of 4 million shares over ten years and noted, in a summary of advantages and disadvantages, that the ESOP would provide slight anti-takeover protection.

At various times over the next two years it appears that management (primarily Bedrosian) continued to consider possible ESOPs of varying sizes as well as ESOP financing alternatives. Late in 1987, the ESOP concept was given more concentrated attention. At a meeting in November, 1987, Booth, Bedrosian and Ralph E. Norwood ("Norwood"), then Assistant Treasurer, agreed that any ESOP would be paid for by the employees. Booth authorized Norwood and Harvey Thayer ("Thayer"), then the Chief Financial Officer, to meet with EC representatives to discuss the ESOP concept. Norwood and Thayer met with the EC's Chairman and Vice Chairman, Nicholas Pasquarosa ("Pasquarosa") and William Graney ("Graney"), in December, 1987.

Norwood explained to the EC representatives that it would not be worth pursuing the matter any further if the employees opposed the idea of creating an ESOP funded by an exchange of employee benefits. At a follow-up meeting later in the month, Pasquarosa and Graney reported that they were interested in the ESOP concept and that they would like to involve members of the EC's benefits sub-committee in the process. A third meeting followed shortly thereafter with the additional employee representatives. At each of the meetings there was discussion of the employee benefits that could be exchanged to pay for the ESOP and the size ESOP that could be established from a given exchange. After the third December meeting, a small group of management and employee representatives, including Norwood and Graney, agreed to meet every Friday to discuss possible exchanges and the content of an ESOP trust document. Those meetings continued through June, 1988.

The funding sources discussed at the weekly meetings included the following:

1. *Section 401(k) matching funds*

Pursuant to § 401(k) of the Internal Revenue Code, Polaroid employees were entitled to contribute up to 14% of their income to a plan whereby Polaroid matched half of the first 4% with a company contribution of Polaroid stock;

2. *Profit sharing retirement contribution*

Approximately one-third of Polaroid's annual profit sharing payments were contributed to a company profit sharing retirement plan;

3. *Elimination of the five year seniority increase*

Prior to 1985, all employees received a one-time 5% pay increase after 5 years of service.[1]

4. *Elimination of first dollar profit sharing;*

5. *Limitation on vacation benefits;* and

6. *Delays of future pay scale increases.*

The Corporate Benefits Committee met four days before the March 29, 1988 board meeting at which an ESOP was to be considered. A "proposed plan" under which the ESOP would own "up to 5%" of the company's outstanding stock was presented, discussed and approved by the committee. Plaintiffs' Exhibit 26, p. 2. (Hereafter, "PX" or "DX" as appropriate.)

D. *The March 29, 1988 Board Meeting*

Although management and employee representatives had been considering an ESOP for sometime, the regularly scheduled March 29 board meeting was the first time that the directors considered whether one should be created. Thayer made a presentation to the board using a set of slides that summarized the mechanics of establishing an ESOP using the § 401(k) matching benefit as a funding source. The slides demonstrated that such an ESOP would be "shareholder neutral"—it would be funded by an exchange of employee benefits and the ESOP shares would be purchased in the open market with the result that the ESOP would not impose any additional cost on the company or have any dilutive effect on the stockholders. Booth led a discussion of this principle and all of the directors agreed that the ESOP should be shareholder neutral.

The board discussed the benefits of an ESOP and were unanimous in the view that employee stock ownership would improve productivity by giving the employees a direct stake in the performance of the company. The minutes of the board meeting indicate that there was also an appreciation of the benefits of an ESOP as a defensive measure. The minutes note that, "[t]he plan should also serve to introduce a note of stability at this time of increasing corporate takeover activity and rumors regarding the Company as a target of such activity." PX 27, p. 6.

There is some dispute as to whether an ESOP of any particular size was approved at the March 29 board meeting. The resolution, which was unanimously approved, states:

RESOLVED, that the adoption of an employees stock ownership plan, is subject to submission and approval by the Board of a detailed plan, approved in principle and that the management of the Company is directed to develop and propose a detailed plan for the consideration of the Board at a future meeting.

*Ibid.* By its terms, the resolution does not purport to address the question of size and several directors testified that they were interested in an ESOP larger than 5% as long as the ESOP remained shareholder

---

[1] Booth and others in management were convinced that the seniority increase was not serving its purpose of promoting performance. Employees viewed this increase an an entitlement rather than a benefit. The Compensation Task Force studied this issue and decided that the increase could be switched to a lump sum payment (on a voluntary basis) in order to get it "out" of the pay check. Booth felt that this was

neutral.[2] However, the press release issued immediately after the board meeting stated:

> Polaroid Corporation announced today. that the Company's Board of Directors has approved the establishment of a leveraged Employee Stock Ownership Plan and a revision to the Company's employee pension plan that will limit the withdrawal of pre-funded assets.
>
> The Employee Stock Ownership Plan (ESOP), as presently envisioned, will own somewhat less than 5% of the outstanding shares in the Company. The annual cost of the plan at that level will be offset by exchanging employee benefits or other forms of compensation to take advantage of existing ESOP tax laws. In its present form, therefore, it will not involve any incremental costs for shareholders on an after-tax basis.

PX 29, p. 1.

Other documents generated after March 29, 1988 support the conclusion that the board approved a 5% ESOP at its March meeting. For example, one of the slides prepared by Norwood for presentation to the MEC and the Futures Group[3] on April 19 and June 7, 1988, respectively, states as the first of several reasons why it would be wise to adopt an ESOP, "OWN = 5% OF COMPANY *NOW*." Another slide prepared for the Futures Group entitled "Polaroid/ESOP Key Events" states, "MARCH 29, 1988 BOD APPROVED CONCEPT OF SHAREHOLDER NEUTRAL W/ [LESS THAN OR EQUAL TO] 5% STOCK." DX 160, p. 7. Indeed, there is evidence that Polaroid's in-house counsel, Richard de Lima ("de Lima"), described the action taken by the board on March 29 as the approval of a 5% ESOP and McCune admitted that he had no recollection of discussions of an ESOP in excess of 5% during the period from March 29 through June 14, 1988. In short, I am satisfied that the press release was accurate—the board approved, in principle, an ESOP of approximately 5% of the outstanding stock.

## E. *ESOP Consideration March 29, 1988 —June 14, 1988.*

Several committees addressed the question of ESOP funding after the March 29 board meeting. On April 19, 1988 there was a meeting of the full EC followed by a meeting of the MEC. The EC discussed several possible funding sources and then voted on alternative proposals in order to be in a position to present its views to the MEC later that morning. The EC adopted as its first position the recommendation that the ESOP be funded entirely by the corporation and not by the employees. Since the committee recognized that this would not be a viable proposal, it also agreed to recommend the alternative that the ESOP be funded by a delay in pay scale changes (annual increases likened to a cost of living increase) and the § 401(k) matching funds.

The MEC considered the recommendation of the EC as well as other possible funding sources. There was some discussion of pay cuts in the range of 2–5% as a possible funding source, but the subject was controversial and there was no recommendation that a pay cut of any size be used to fund an ESOP.

The Futures Group also deliberated on the subject. At least one-half of a two day off site retreat held on June 7–8, 1988 was devoted to ESOP funding. Management representatives made presentations to the Futures Group explaining the mechanics of an ESOP, the concept of shareholder neutrality and background information as to ESOPs created by other companies. A number of funding sources were then reviewed with the Futures Group and there-

---

no solution and was looking for a more productive way to spend this money.

**2.** The 5% figure comes from Thayer's presentation in which he explained that the exchange of the § 401(k) match and the profit sharing retirement contribution would save approximately $8 million per year and that those exchanges combined with various tax incentives would be sufficient to fund an ESOP of somewhat less than 5% of Polaroid's outstanding stock at the then prevailing market price.

**3.** This was a committee of employees and managers that met for two days to develop a recommendation on ESOP funding.

after sub-groups were formed to consider alternatives. The Futures Group reported its conclusions to Booth by memorandum dated June 9, 1988. Working from the "assumption" that "any option which reduces current income is unacceptable," the Futures Group recommended a six or nine month delay in the annual pay scale change as the ESOP funding source. PX 132.

In addition to committee recommendations, Booth received advice and input from various corporate officers. For example, Norwood sent a memorandum to Booth on April 25, 1988 designed to assist Booth in his decision about the ESOP funding. The memorandum identified the § 401(k) match, pay scale increase delays and profit sharing retirement funds as the three possible funding sources that had received the most attention and outlined the pros and cons of each of those options. Booth also discussed this subject with several senior officers.

The evidence as a whole suggests, as may often be the case, that Booth was receiving different recommendations from different people and that support could be found for almost any funding decision. The choices ranged from a current pay cut (which was supported by one corporate officer as being a way of getting the employees' attention) to the corporate treasury (which was the official first choice of the EC). However, as Norwood recognized in his April 25, 1988 memo to Booth, the three funding sources that received the most attention and that were generally the most acceptable to various constituencies were the § 401(k) match, delayed pay scale increases and the use of profit sharing retirement funds.

### F. The June 14, 1988 Board Meeting.

The second time that the Polaroid board considered an ESOP was at its regularly scheduled meeting on June 14, 1988. The ESOP plan document, titled the "Polaroid Stock Equity Plan," was approved and adopted, subject to a tax determination.

The board resolution authorized various officers to execute documents and take other steps necessary to put the ESOP into effect. It does not appear that the board discussed the size of the ESOP or appropriate funding sources. Rather, the directors reviewed the plan document and discussed the mechanics of the ESOP as set forth in that document. The Polaroid Stock Equity Plan, as approved on June 14, 1988 and executed on June 21, 1988, provides for annual allocations made on the last day of each year. See Px. 31 at 22. The allocation provisions were amended less than one month later at the special meeting held on July 12, 1988.

### G. Shamrock Expresses its Interest in Polaroid.

As of June 16, 1988, Shamrock had acquired slightly less than 5% of Polaroid's outstanding stock. On that day, Disney and Gold tried to reach Booth by telephone to request a meeting with Polaroid. Booth was out of town, but he discussed the request with de Lima and then instructed his secretary to advise the Shamrock representatives that he probably would not be available to meet in the near future. Booth cut short his trip and returned to Boston the next morning. He conferred with Kenneth Tuchman ("Tuchman"), of Shearson, Lehman, Hutton,[4] about the Shamrock contact and Tuchman advised Booth to take a "wait and see" approach.

Disney memorialized his interest in having a meeting in a letter to Booth dated June 17, 1988. The letter confirmed the rumor that Shamrock had a substantial investment in Polaroid and explained that Shamrock was interested in having a meeting with Polaroid management "to establish the ground work for a good relationship with the Company." PX 73, p. 1. The letter concluded with a request that Booth reconsider the question of having a meeting. Shamrock also attempted to persuade Booth to meet by asking other directors to speak to Booth on Shamrock's behalf. A

---

**4.** Tuchman is the Managing Director of Mergers and Acquisitions at Shearson, Polaroid's investment adviser.

representative from Wertheim Shroder & Co. ("Wertheim"), Shamrock's investment banker, contacted one of Polaroid's outside directors who, after being told that Shamrock was not "hostile," agreed to pass along Shamrock's request for a friendly meeting.

From Polaroid's side, the Shamrock letter, received by Booth on June 22, came as a "cold shower." The "wait and see" period ended. Booth called Tuchman and a strategy meeting was scheduled for June 24. Prior to that meeting Booth had Norwood prepare a financial analysis demonstrating how an acquiror might finance the acquisition of Polaroid. Booth had previously been given a collection of material about Shamrock, its officers and its investment patterns.

The June 24 strategy meeting was attended by Polaroid's legal and investment advisers. In the context of considering the Shamrock letter, the group discussed various defensive strategies including an ESOP. Tuchman recalls having been told that the board had approved a 5% ESOP and there were general discussions about increasing the size of the ESOP. Tuchman told the group that an ESOP would add to Polaroid's defensive posture, but there was recognition that a potential disadvantage of a larger ESOP would be the uncertainty as to how employees would react to the "give-ups" that would be necessary to fund a larger ESOP.

With respect to the Shamrock letter, it was decided that Polaroid would agree to a meeting only if Shamrock would accept three conditions: (1) it would not buy any additional Polaroid stock and cross the 5% threshold prior to the meeting; (2) it would not make any proposals at the meeting that would require public disclosure; and (3) it would not purchase any Polaroid stock for a reasonable period of time after the meeting. Tuchman was authorized to contact Shamrock and set up a meeting subject to these conditions.

Tuchman made the arrangements for the meeting with Ilan Kaufthal ("Kaufthal"), a Managing Director of Wertheim. There is a direct conflict in the testimony given by Tuchman and Kaufthal as to one significant aspect of their conversations. Tuchman notified Kaufthal that Polaroid would be willing to meet with Shamrock if Shamrock would agree to the three conditions. After Kaufthal indicated that the conditions would not be a problem for Shamrock, the two men discussed the date of the meeting. Kaufthal asked that the meeting be held during the week of June 27, but Tuchman responded that Booth was going to be out of the country until after July 4, 1988.

Kaufthal testified that he became concerned that Polaroid was stalling and that he expressly requested an assurance from Tuchman that Polaroid was not buying time in order to take some step that would adversely affect Shamrock. Kaufthal claims to have asked for a promise that Polaroid would not change the status quo prior to the meeting. According to Kaufthal, Tuchman made that promise, saying that it was "no problem" since Polaroid did not have any such plans. 10/20 Tr., p. 78. Tuchman claims only to have promised that Polaroid would not be sold prior to the meeting. In any case, the meeting was scheduled to be held on July 13 in New York and arrangements were made so that Tuchman could telephone Gold immediately before the meeting to confirm that Shamrock had complied with Polaroid's conditions.

Shamrock satisfied its pre-meeting obligations at considerable expense. In order to keep from going over 5%, Shamrock reversed all of the outstanding put contracts it had previously sold at a total cost of slightly over $500,000. In addition, Gold testified that, absent the conditions imposed by Polaroid, Shamrock would have been buying more Polaroid stock. Shortly after Polaroid cancelled the meeting, Shamrock purchased an additional 1.9 million shares for which it seeks damages, based upon an increase in the market price, in the amount of $3.4 million.

H. *Events Leading to the July 12, 1988 Board Meeting.*

On June 26, 1988, two days after the strategy session over the Shamrock letter,

the MEC held a special Sunday morning meeting. The Polaroid officers discussed the "implications" of Shamrock's letter and Booth announced that he wanted a larger ESOP funded in part by the five year seniority increase. Booth apparently was surprised that the MEC (which in April had been unable to agree upon even a 2% pay cut to fund the ESOP) was aggressively pushing a large ESOP. Booth even got to the point where he had to play "devil's advocate" and point out to his senior people that pay cuts would not be an easy thing to sell to the employees. 11/9 Tr., p. 225. During the course of the discussion, the committee members were advised that an ESOP greater than 18½% would require stockholder approval. Although the committee members were pushing for an ESOP of 20% or more at this meeting, when they learned of this additional requirement, they agreed that 18½% would be the cap on the ESOP. As Booth explained, there was "no question" but that everyone wanted to put together the ESOP quickly because of the Shamrock letter. 11/14 Tr., p. 200. By working back from 18½%, using current market prices and allowing for a margin of error, the committee arrived at the round figure of $300 million as the size of the ESOP.

Immediately following the MEC meeting, Norwood was assigned the task of determining appropriate benefit exchanges and pay cuts that would add up to $300 million. His handwritten notes of the same date confirm the link between the implementation of the ESOP and Shamrock's expression of interest in Polaroid. For example, Norwood's time table called for the implementation of the ESOP on July 11—two days before the scheduled Shamrock meeting. In addition, under the head "Issues to Resolve," Norwood noted the need for "acceptable, creative option for trustee when 0 or small % is allocated to employees...." PX 138, p. 4. Norwood acknowledged that

this note was a reference to 8 *Del. C.* § 203 and the need to have ESOP shares allocated to employees in order to allow them to express their opinions with respect to a potential raider.[5]

By June 29, 1988, it appears that Booth had decided upon some of the funding sources for the $300 million ESOP. He called a meeting with Graney and Pasquarosa that day and told them that the ESOP would be funded with a 5% pay cut, the § 401(k) matching funds, a delayed pay scale change and the profit-sharing retirement contribution. The two employee representatives argued against the 5% pay cut and pointed out the severe financial impact that would have on employees. After Booth made it clear that his decision was final, the employee representatives then suggested that some adjustment be made for the lowest paid employees, who would find a 5% pay cut the most burdensome. In response to this concern, a modification was made so that the lowest paid employees did not receive an immediate pay cut and the second lowest paid employees received a pay cut of only 2½% instead of 5%.

The next regular board of directors meeting was scheduled to be held on July 26, 1988. However, by July 1, 1988, arrangements were being made to hold a special board meeting before mid-July. According to Booth, it was Polaroid's employees that dictated the need for and timing of the special meeting. The summer shutdown, during which time most of the employees would be on vacation, was scheduled for the last two weeks in July. Booth anticipated that the board would approve the $300 million ESOP (funded in part by pay cuts) and he recognized the importance of effectively communicating this decision to Polaroid's employees. If the board were to meet and act during the shutdown, employees would read about their pay cut in the newspaper. To avoid this result, the meeting

---

5. Pursuant to 8 *Del.C.* § 203, an interested stockholder (one owning more than 15% of the company's stock) may not engage in a business combination with the company for three years after becoming an "interested stockholder" unless, among other things, the stockholder acquires at least 85% of the company's stock in the same transaction that resulted in the stockholder becoming an interested stockholder. § 203(a)(2) Stock held by employee stock plans is excluded from the 85% calculation unless the employees have the right to tender their ESOP shares confidentially.

had to ·be rescheduled. Booth wanted to have the special meeting as soon as possible because he wanted to "get going," 11/14 Tr., p. 241, and the earliest date that the directors were available turned out to be July 12, 1988.[6]

On July 11, 1988, the day began and ended with meetings. In the morning, Booth and several senior advisers met in New York with Polaroid's lawyers and investment banker. The group discussed the ESOP and the fact that the Shamrock meeting would have to be cancelled because of the ESOP.[7] It was agreed that Tuchman should cancel the Shamrock meeting although it is not entirely clear whether Tuchman was to notify Shamrock of this change before or after the July 12 board meeting. There was some discussion of the fact that it would be awkward to cancel the Shamrock meeting without also divulging material non-public information about the forthcoming meeting. Interestingly, it appears that there was no discussion of the possibility that, if Shamrock were notified of the change in plans on July 11, it might take some action on July 12 before the Polaroid board announced its decisions. In any event, Shamrock did not learn that the meeting had been cancelled until July 12.

The other Polaroid meeting on July 11 was a dinner meeting of outside directors. The meeting was suggested by Silver, Polaroid's General Counsel, and was attended by special outside Delaware counsel who was there to explain to the directors their responsibilities in a takeover context.

## I. The July 12, 1988 Board Meeting.

The special board meeting began at approximately 8 a.m. and lasted for about six hours. The meeting was called on less than one week's notice and, as a result, three outside directors were unable to attend and a fourth had to leave the meeting before any votes were taken. Contrary to general practice, the directors received no written materials prior to the special meeting.

The first part of the meeting was an executive session during which Booth described the overtures from Shamrock[8] and outlined the "comprehensive plan" that was to be presented to the board later that morning. When the board went into regular session, members of senior management and legal and financial advisers joined the meeting and the elements of the comprehensive plan were discussed and approved. According to Polaroid's witnesses, the comprehensive plan consisted of the following four elements, each designed to increase profitability independently and in synergy with the other elements: (1) the reorganization and redirection of Polaroid's business and research and development to emphasize targeted areas; (2) voluntary severance and early retirement plans designed to reduce the size of the work force rapidly; (3) the ESOP; and (4) the decision to enter the worldwide market for 35 millimeter conventional film. It appears that the elements of the comprehensive plan had been considered separately for some period of time and were not consolidated into a package until the July 12 board

---

**6.** It is worth noting that the special meeting was held one day before the Shamrock meeting. Although Polaroid down played the significance of Shamrock in its ESOP decisions, there is evidence that the scheduling of the special meeting was tied to Shamrock rather than the summer shutdown. Several of Polaroid's directors testified that, when they were contacted by de Lima about the scheduling of the special meeting, de Lima explained that the meeting was being held in response to an approach by Shamrock and that it was very important that they attend. In addition, Booth never gave any thought to scheduling the special meeting after the summer shutdown instead of before. If the only reason that the regularly scheduled July 26 board meeting had to be rescheduled was because of the summer shutdown, it would be logical to consider alternative dates both before and after the vacation.

**7.** Booth had determined that he would have to participate in the employee group meetings that were being set up for the day following the July 12 board meeting. Accordingly, he would not have time to meet with Shamrock on July 13.

**8.** The minutes are not a model of accuracy. They state that a meeting with Shamrock was scheduled for July 13 when, by the time of the board meeting, the decision had been made to cancel the Shamrock meeting. The minutes also refer to two proposals made by Harlor, who did not even attend the meeting.

meeting.[9] For example, according to Booth the decision to go into 35 millimeter film was made in May and was to have been approved at the June 14 board meeting, but the directors ran out of time.

The ESOP was discussed for about two hours and the witnesses agreed that the one issue that was given the most attention was shareholder neutrality and the financial projections comparing compensation and benefit exchanges to the cost of the ESOP borrowings. Although the directors had approved the concept of an ESOP on March 29 and the plan document on June 14, they had never considered an ESOP as large as $300 million and they had never considered funding an ESOP (regardless of its size) with employee pay cuts. The directors did not question the ESOP size chosen by management and they did not ask about or discuss alternative funding sources. Rather, the directors discussed the following ESOP-related matters:

1. The ESOP funding sources—5% pay cut, delayed pay scale increase, § 401(k) matching funds and profit sharing retirement plan contribution;

2. How the $300 million would be obtained—the terms of the $285 million ESOP borrowing and the fact that Polaroid would make an immediate $15 million cash contribution;

3. The possible dilutive effect of the ESOP if the borrowed funds were not used to repurchase shares;

4. The prospect that employees would make stockholder decisions (such as tendering and voting decisions) from a long-term rather than short-term perspective;

5. The likelihood that there would be something of a morale problem when the employees were told about the pay cut and the importance of management/employee communications on that subject;

6. The prospect that the significant stockholder interest being provided by the ESOP would give the employees greater incentive to make the company profitable; and

7. The need to amend the ESOP plan document to allow semi-annual allocations of shares in order to have stock in the employees' hands before their pay cut took effect.

Other matters relating to the ESOP were not discussed at the board meeting:

1. The fact that the Futures Group considered it unacceptable to fund the ESOP in part with a pay cut;

2. The fact that the EC strongly opposed the use of a pay cut as a funding source;

3. The fact that both committees suggested alternative funding sources that would have been considered acceptable;

4. The fact that the Compensation Task Force, after two years of study, opposed the elimination of the five year seniority increase or any other cut in current pay;

5. The fact that Polaroid is subject to 8 *Del. C.* § 203 and the likely effect a 14% ESOP would have under that statute; and

6. The fact that management viewed the ESOP as a defensive measure and considered it important that the ESOP be in place "before a raider surfaces." PX 40, p. C0000603.

After the ESOP discussions (which included slide presentations on the key elements of the ESOP plan and the financial ramifications of it) the board unanimously adopted resolutions authorizing the implementation of the $300 million ESOP, including: (i) amendments to the plan document, (ii) authorization to issue Polaroid shares, and (iii) authorization to borrow the funds necessary for the ESOP. The directors authorized the repurchase of up to $300 million in common stock on the open market if and when such purchases are deemed advisable and approved: (a) pension plan amendments designed to encourage early retirement, (b) a voluntary severance plan, (c) amendments to Polaroid's PAYSOP to provide for confidential, pass-through voting and tendering, and (d) the proposal to expand marketing of conventional film worldwide.

9. Polaroid's Public Relations Department coined the term "comprehensive plan."

## J. *Events Following the July 12 Board Meeting.*

Immediately after the July 12 board meeting, a press release was issued announcing the adoption of the comprehensive plan. The press release is inaccurate in one respect. It states that the newly created leveraged ESOP "owns" about 10 million shares of Polaroid stock. PX 42, p. 4. In fact, as of the date of the press release, the ESOP trustee did not own any shares of Polaroid stock. That stock was not acquired until July 19, 1988. Although plaintiffs may suspect that this misstatement was intentional, the evidence does not support such a finding.

Shamrock responded to the events of July 12 in a letter to Booth dated July 19, 1988. Gold expressed his dismay and disappointment both with respect to the cancellation of the meeting and the decision to adopt the comprehensive plan. Gold went on to advise Booth that Shamrock instructed its counsel to file an action against Polaroid challenging the ESOP. He concluded with a proposal to acquire Polaroid for $40 in cash or a lesser amount to be agreed upon plus the right to receive a pro rata share of the proceeds of any recovery in the Kodak litigation. This suit was filed the next day and, as noted earlier, Shamrock commenced its tender offer on September 9, 1988.

## II.

While there were many issues tried and briefed by the parties, the claims with respect to the ESOP may be distilled into a few basic propositions. Plaintiffs contend that the ESOP was a defensive measure adopted in response to the overture by Shamrock. They say that the process by which the directors approved the ESOP was flawed in at least two respects: (1) the directors were both misinformed and uninformed as to material facts relating to their decision; and (2) they did not undertake the analysis mandated by *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985) when a board is reacting to a takeover threat. Defendants' response is equally direct. They contend that the facts disprove plaintiffs' claims. In any case, defendants argue that the ESOP can withstand even the highest level of judicial scrutiny. That being so, it becomes irrelevant whether the "process" was tainted, since the result is a plan that is entirely fair.

■■■ It is settled law that directors are responsible for managing the business and affairs of a Delaware corporation and, in exercising that responsibility, they are "charged with an unyielding fiduciary duty to the corporation and its shareholders." *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 872 (1985). Ordinarily, where the directors are disinterested, their decisions will be protected by the business judgment rule, "a presumption that in making a business decision the directors ... acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 812 (1984). Where the business judgment rule is properly invoked, the directors' decision will be upheld absent an abuse of discretion. However, the protections of the business judgment rule will not be afforded to directors who fail "to inform themselves, prior to making a business decision, of all material information reasonably available to them." *Ibid.* Directors have "an affirmative duty" to protect the financial interests of the stockholders and must "proceed with a critical eye" in acting on their behalf. *Smith v. Van Gorkom*, 488 A.2d at 872.

■■ The business judgment rule is available to directors even where they are responding to a takeover threat. In those circumstances, however, there is an "omnipresent specter that a board may be acting primarily in its own interests...." *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946, 954 (1985). As a result, before the business judgment rule will be applied in this context, the directors must establish "reasonable grounds for believing that a danger to corporate policy and effectiveness existed" and the defensive measure chosen by the board must be "reason-

able in relation to the threat posed." *Id.* at 955.

The parties debate at length the applicability of the business judgment rule. On the question of whether the directors were fully informed, plaintiffs point out several similarities between this case and two others where our Supreme Court recently struck down board decisions for lack of information. *See Smith v. Van Gorkom, supra; Mills Acquisition Co. v. Macmillan, Inc.,* Del.Supr., 550 A.2d 35 (1988) (Trans.). Here, as in *Van Gorkom,* the meeting was called on short notice and the directors were given no written materials with which to prepare for the meeting. Only two hours were devoted to the ESOP decision and the Polaroid directors did not have the benefit of all information reasonably available to them because management did not provide it to them and the directors did not ask.[10] Plaintiffs say that the Polaroid directors were not only uninformed, as were their counterparts in *Van Gorkom,* but also misinformed, as were the directors in *Macmillan.* According to plaintiffs, Booth actively misled the Polaroid directors by failing to inform them that the EC, MEC, and Compensation Task Force all opposed employee pay cuts.

On the question of whether *Unocal* applies, plaintiffs point to a variety of Polaroid's internal documents evidencing management's view that the ESOP is defensive.[11] They also note the strategy sessions that immediately followed Shamrock's overture, the speed with which Booth thereafter decided upon the size of the ESOP (three times larger than previously discussed with the board) and the great haste to call a special meeting.

Defendants dispute some of plaintiffs' facts and virtually all of the inferences drawn from those facts. In addition, the parties appear to have differing views as to the applicable law. For example, on the question of due care, defendants rely heavily upon the application of the gross negligence standard. There is no question but that the directors did not know all of the relevant facts.[12] However, defendants argue that a board's failure to become fully informed does not take its decision outside of the protection of the business judgment rule unless its lack of information was so extreme as to reflect gross negligence on the part of the directors.

The Polaroid directors were not, as in *Van Gorkom,* uninformed as to the value of their company when the issue before them was a merger proposal. Rather, in the context of deciding upon an ESOP they were, arguably, uninformed as to the formal position of several groups that opposed pay cuts. Of course, all of the directors knew that employees would not be happy with the idea of a pay cut. In short, defendants say that both the importance of the information and the extent of the directors' general knowledge on the subject in this case are far different from the facts in *Van Gorkom.* Defendants distinguish *Macmillan* by the relative unimportance of the information withheld from the board and Booth's lack of financial interest in the transaction he was proposing.

The *Unocal* issue also raises some interesting questions. The directors contend that they were not acting in response to any takeover threat—either specific or generic. Thus, the directors did not undertake any investigation as to the nature of the purported threat and they failed to evaluate whether the ESOP constituted a reasonable response to the "threat." The evidence establishes that management was responding to a takeover threat. It is not

---

**10.** The two subjects plaintiffs stress in this regard are the defensive aspects of the ESOP (management's perception that the ESOP would provide protection against a takeover and the operation of 8 *Del.C.* § 203) and alternatives to the funding sources and size of ESOP recommended to the board by management. Plaintiffs argue that this information is material to the ESOP decision.

**11.** *See, e.g.,* PX 5, 40 (Impetus for ESOP is defense; second of five reasons for an ESOP is, "...add to defenses of 'opportunistic' raider...."), 53, 215, 395, 398.

**12.** It is undisputed that there was no discussion of § 203 and that the directors were never told about the various committees' opposition to pay cuts.

as clear that the outside directors were operating in a defensive mode.[13]

*Unocal* starts from the premise that the transaction at issue was defensive. Since then, this Court has made preliminary determinations as to the applicability of *Unocal* in several cases where defendants, like the Polaroid directors, claimed that they were not responding to any threat. *See, e.g., Doskocil Companies, Inc., et al. v. Griggy, et al.,* Del.Ch., Civil Action No. 10,095, Berger, V. C., 1988 WL 85491 (August 18, 1988); *Henley Group, Inc. v. Santa Fe Southern Pacific Corporation, et al.,* Del. Ch., Civil Action No. 9569, Jacobs, V. C., 1988 WL 23945 (March 11, 1988). However, none of those cases address the issue, arguably presented here, of whether a board, largely composed of disinterested directors, should be deemed to be acting from the same motives as the members of management who proposed the transaction. It is also less than clear whether, if the decision is deemed defensive, this Court may undertake the *Unocal* analysis for the board where the directors failed to do so. *See Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d at 955 (the determination as to whether a defensive measure is reasonable "entails an analysis *by the directors* of the nature of the takeover bid and its effect on the corporate enterprise.") (Emphasis added); *Cf. Henley Group, Inc. v. Santa Fe Southern Pacific Corporation, et al., supra.*

■ The duty of care claim and the issues with respect to the applicability of *Unocal* present legal and factual questions for which answers would be offered if necessary to the disposition of this case. However, neither a board's failure to become adequately informed nor its failure to apply a *Unocal* analysis, where such an approach is required, will automatically invalidate the corporate transaction. Under either circumstance, the business judgment rule will not be applied and the transaction at issue will be scrutinized to determine whether it is entirely fair. *See Mills Acquisition Co. v. Macmillan, Inc.,* Del. Supr., 550 A.2d 35 (1988); *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d at 958; *Smith v. Van Gorkom,* 488 A.2d at 893.

■ There are several factors to consider in evaluating the fairness of the ESOP. The first and most obvious question is whether the ESOP is funded in whole or in part by the company. Even if the ESOP is "shareholder neutral," consideration must be given to: (1) its impact on business operations (i.e., whether it enhances or impairs productivity); (2) its anti-takeover effect; and (3) its dilutive effect. The burden of proof rests with defendants.

■ The evidence establishes that the ESOP is being funded by the employees rather than the corporation and the stockholders. The ESOP borrowed a total of $300 million (Polaroid borrowed $285 million with a ten year bank loan and $15 million came from Polaroid's cash on hand) and used those funds to purchase 9.7 million newly issued Polaroid shares. According to management's calculations, approximately $45 million is needed to amortize the ESOP loan. Of that amount, approximately $9 million per year is generated by dividends and tax deductions.[14] The remaining $36 million of the annual amortization payment comes from employee exchanges: (1) the 5% pay cut ($19 million based upon 1988 pay levels); (2) 3% reduction in pay scale increases on April 1, 1989 ($11 million); (3) elimination of § 401(k) match ($6 million); and (4) elimination of profit sharing retirement bonus ($2 mil-

---

**13.** Defendants, undoubtedly recognizing the Court's reluctance to do so, suggest that the only way this Court could find that the directors were operating defensively would be if it were to decide that these men of distinction are all liars. I do not believe that is the case. As I recall the testimony, the directors were asked whether, in approving the ESOP, they were acting to entrench themselves in office. Each witness answered in the negative. However, there is a difference between acting for entrenchment purposes and acting defensively to protect the company and its stockholders from some perceived threat.

**14.** Polaroid pays annual dividends and the ESOP is structured so that dividends on ESOP shares are used to repay the loan. In addition, the company is allowed to take a tax deduction on dividends paid on ESOP shares.

lion). These figures total $38 million or $2 million more than needed to maintain the "shareholder neutrality" of the ESOP.

Moreover, although it was projected that the "income" from these exchanges would be less than $36 million during 1988 and 1989,[15] the total exchanges are projected to grow from $40 million in 1990 to $60 million in 1997. Norwood calculated the present value of the exchanges using two different discount rates and determined that it exceeded the present value of the loan and debt service. Finally, to the extent that the ESOP accomplishes its purpose by improving productivity, certain of the exchanges will increase and, instead of being shareholder neutral, the ESOP will become shareholder "positive."

Even though the ESOP is not funded by the company, there are other potential costs that must be considered. There was a great deal of testimony (including corroboration from Shamrock witnesses) that ESOPs generally promote better employee morale and productivity. In corporations such as Polaroid, where there is a close identification between employees and the company, the evidence establishes that ESOPs are even more effective as employee motivators. However, this particular ESOP is funded, in part, with a mandatory 5% pay cut and Polaroid had never instituted an across the board pay cut in its fifty year history. Is it reasonable to expect that employees will become more productive or even remain at their pre-ESOP levels when they are being forced to defer a portion of their current income? Various members of management and several directors thought about this and concluded that the Polaroid ESOP would still serve its purpose of enhancing productivity. However, they did not profess any expertise on the subject of ESOPs funded by pay cuts.

On the other hand, there was no direct evidence that the Polaroid ESOP is likely to do anything but improve productivity. Plaintiffs did stress the fact that the employees (and several committees with management representatives) were opposed to a pay cut. This fact suggests that the ESOP would not have been implemented in its present form if the decision were put to a vote of the Polaroid work force. Does that also mean that the ESOP, having been implemented, will not be effective? I think not. Although the ESOP may not be terribly popular, there is simply no evidence that the employees will express their displeasure by cutting back on productivity. They still have jobs which, one must presume, they wish to retain. In addition, they now have Polaroid stock, which will be more valuable if the company shows greater profits. In sum, I am satisfied that the ESOP does not impose a hidden cost in the form of decreased productivity that would make it less than fair to Polaroid and its stockholders.[16]

Although stockholders have no contractual right to receive tender offers or other takeover proposals, *Moran v. Household Intern'l., Inc.*, Del.Ch., 490 A.2d 1059, 1070 (1985), *aff'd*, Del.Supr., 500 A.2d 1346 (1985), it seems appropriate to consider the ESOP's anti-takeover effect as part of an entire fairness evaluation. Approximately 14% of Polaroid's outstanding stock (9.7 million shares) was issued to the ESOP in late July, 1988. A small portion of that stock was then retroactively allocated to the Polaroid employees entitled to participate in the ESOP. Similar allocations will be made twice a year over the next 10 years so that, at the end of 10 years, all 9.7 million shares will have been allocated to the employees' retirement accounts. The ESOP stock becomes available to the employees (or their estates) only upon termi-

15. In 1988 the numbers are less than the annual projection because the diversion of funds did not begin until the year was half over. The numbers for 1989 also represent less than a full year of savings because they include an adjustment to the pay scale increase that will not take place until April 1, 1989.

16. ESOPs are widely recognized as an effective means of providing "strong employee incentive toward productivity." *Edelman v. Phillips*, Del. Ch., Civil Action No. 7899, Walsh, V.C., 1985 WL 11534 (February 12, 1985) (slip op. at 16). A recent article in *Harvard Business Review* reported on a study of ESOPs and found that, "[t]he data couldn't be clearer: companies do better after setting up ESOPs." DX 152 at 127.

nation, retirement or death. For the next ten years, dividends earned on the stock allocated to each employee's account will be used to help pay for the stock. Thereafter, dividends will be credited to the employees' accounts. However, as with the stock itself, the dividends will not be available to the employees until they stop working for Polaroid.

The ESOP provides for confidential and "mirrored" voting and tendering. In the case of a tender offer, for example, the ESOP stockholders may direct the trustee to tender those shares allocated to their accounts. The trustee must honor those directions and maintain their confidentiality. In addition, the trustee must tender the same proportion of unallocated shares. Thus, although most of the ESOP shares have not yet been allocated to employees, they nonetheless control 14% of the stock.

There was great controversy, but not very much evidence, on the issue of how the ESOP affects unsolicited takeover attempts. Plaintiffs clearly believe that ESOP stockholders will be friendly to management. Several factors support such a belief. The ESOP shares allocated to each employee's account represent only a small fraction of that employee's annual salary. Thus, if an employee were being asked to choose between a better return on his ESOP investment and the possibility that he will lose his job, it is reasonable to anticipate that the employee will forego the investment opportunity in favor of job security.

An unsolicited tender offer almost inevitably will raise concerns about job security —concerns which are easily heightened during management's daily contact with the employees. Added to this understandable concern about job security is the fact that an ESOP stockholder is unable to "cash in" on his investment. If an acquiror offers a substantial premium in a tender offer, other stockholders might decide to tender with the idea that they will use the cash proceeds either for other investments or for personal items. The ESOP stockholder who decides to tender receives no cash for personal use and cannot control the reinvestment of the proceeds. For this reason, as well, an ESOP stockholder is less likely to tender than a public stockholder.

The provisions of 8 *Del. C.* § 203 are significant in light of the size of this ESOP (14%) and the factors indicating that ESOP stockholders will be disinclined to tender their shares. Under the newly enacted takeover statute, a prospective acquiror is prohibited from engaging in any business combination with the target corporation for three years after becoming an "interested stockholder" unless, among other things, the acquiror obtains at least 85% of the voting stock of the target company in the same transaction that causes it to become an interested stockholder (i.e., a party owning at least 15% of the company's stock). 8 *Del. C.* § 203(a)(2).[17]

For purposes of the 85% exception, shares held by inside directors and those held by employee stock plans that do not have confidential tendering are not considered outstanding shares. The stock held by the Polaroid ESOP, which does provide for confidentiality, would be included in the 85% calculation under § 203(a)(2). If, as plaintiffs suggest, the ESOP stockholders will side with management and refuse to tender, then neither Shamrock nor any other potential acquiror will be able to satisfy the 85% requirement of § 203(a)(2).

When viewed as a permanent obstacle to any tender offer, plaintiffs argue that the ESOP cannot possibly be a reasonable response under *Unocal* and, implicitly, it cannot be entirely fair. The Shamrock tender offer, although tending to refute the general statement that the ESOP is an obstacle to tender offers, provides evidence that the ESOP diminishes the acquisition value of the public shares. If the ESOP is invalidated, Shamrock is offering to pay $42 per

---

17. The other exceptions to the three year bar on business combinations require approval by the existing target board [§ 203(a)(1)] or board approval after the stock is acquired plus a ⅔ vote of the shares not held by the interested stockholders [§ 203(a)(3)].

share to all stockholders. With the ESOP in place, Shamrock's offer is for $40 per share.

■ I find that the anti-takeover aspect of the ESOP does not make it less than fair. Given its confidentiality provisions, it cannot be said that management controls the employees' tendering decisions. The evidence does establish that management has a leg up based upon its easy access to the employees and their likely concern about job security. However, there is no evidence that the ESOP is a "lock-up" or that the leg up it gives management in any way harms the company or its public stockholders. The ESOP may mean that a potential acquiror will have to gain the employees' confidence and support in order to be successful in its takeover effort. However, there has been no showing that such support is or would be impossible to obtain.

In reaching this conclusion, I find it significant that § 203 excludes from the 85% exception ESOPs that do not have confidential tendering provisions but includes an ESOP such as the one adopted by Polaroid. I do not read the statute as automatically blessing any ESOP with confidential tendering. The statute provides guidance in a negative sense. It is a policy statement that ESOPs with confidential tendering are not suspect—they will not necessarily interfere with an acquiror's ability to obtain 85% of the voting stock of a target corporation.

Two remaining aspects of the ESOP are of some concern. Because the ESOP shares were issued by the company instead of being purchased on the market, the public stockholders' interests have been diluted. The $300 million used to purchase the ESOP stock is available to the company for open market repurchases. If a decision were made to repurchase stock and if the market price were the same as that paid by the ESOP, the net result would be no dilution. However, Polaroid is not obligated to repurchase shares and, based upon the trading prices since Shamrock announced its acquisition proposal, Polaroid would be unable to repurchase the same number of shares as were issued to the ESOP.

Management's chart indicates a reduction in earnings per share ranging from $.25 to $.09 on projected earnings per share without the ESOP of $1.79–$2.18 for the period from 1988 through 1990. However, those calculations did not include any increase in Polaroid's earnings resulting from the anticipated increase in productivity associated with the ESOP. If, as Polaroid's management and directors apparently believe, the ESOP will result in increased productivity, any dilution caused by the issuance of the ESOP shares should be more than offset by increased earnings.

■ There is and can be no hard evidence as to what the dilutive effect of the ESOP will be. There may be no dilutive effect, if the company is able to make open market purchases at prices of approximately $30 per share or if the ESOP generates sufficient additional revenues to increase productivity. Assuming neither, the ESOP will cause a reduction in earnings per share of approximately 5%. If the ESOP's only purpose were to help thwart hostile takeovers, I doubt that it would be considered entirely fair where it dilutes the public stockholders' earnings per share. However, the evidence is uncontradicted that ESOPs promote productivity. If the ESOP shares were purchased on the open market, there would be a cost involved in terms of the delay in implementing a large ESOP.[18] On balance, I find that a minimal reduction in earnings per share is fair where, as here, it is necessary in order to promptly implement a large ESOP that is intended to increase corporate earnings.

■ A related matter is the price at which the shares were sold to the ESOP—$30.875. That price was the mean of the high and low trading prices on July 12,

18. Under the rules of the New York Stock Exchange, Polaroid would be limited in the number of shares it could repurchase to about 100,000 shares per day.

1988. The stockholder plaintiffs argue that the price paid by the ESOP was unreasonably low. Defendants knew, when they set the ESOP price, that Shamrock had accumulated a significant amount of stock and was interested in meeting with management to discuss its investment. By setting the ESOP price before Shamrock's position was made public, the stockholder plaintiffs argue that defendants favored their employees over the public stockholders.

I find this argument to be without merit. The information known to defendants but not reflected in the public market was not material under controlling Delaware law or, to the extent that it may be any different, federal law. *Bershad v. Curtiss–Wright Corp.*, Del.Supr., 535 A.2d 840 (1987); *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Under *Bershad*, the Shamrock overture is immaterial as a matter of law. Its only significance is as a possible forerunner to an acquisition proposal. Since the Shamrock letter makes no such proposal and includes no terms, it does not satisfy *Bershad*. The more recent decision in *Basic*, although rejecting any "bright line" test, would support the same result.

> Whether merger discussions in any particular case are material ... depends on the facts. Generally ... a factfinder will need to look to indicia of interest in the transaction at the highest corporate levels. Without attempting to catalog all such possible factors we note by way of example that board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries may serve as indicia of interest.

> \*    \*    \*    \*    \*    \*

> No particular event or factor short of closing the transaction need be either necessary or sufficient by itself to render merger discussions material.

*Basic Inc. v. Levinson*, 108 S.Ct. at 987. Here, there were no merger discussions, board resolutions, negotiations or the like. Shamrock simply expressed its interest in a "friendly" meeting. If, as I find, Shamrock's overture was not material, it follows that defendants did not act unfairly in setting the ESOP purchase price before there was any public disclosure of Shamrock's position.

This Court is unaware of any case where an entire fairness analysis was applied to an ESOP. Typically, this rigorous standard of review is applied in self-dealing transactions involving a merger or sale of assets. *See, e.g., Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701 (1983); *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929 (1985). In the merger context, our Supreme Court has recognized that "fairness ... can be equated to conduct by a theoretical, wholly independent, board of directors acting upon the matter before them." *Weinberger v. UOP, Inc.*, 457 A.2d at 710, n. 7. Thus, the fact that the merger price was vigorously negotiated by an independent committee of outside directors provides "strong evidence" that the transaction is inherently fair. *Ibid.*

In reviewing a decision to establish an ESOP it seems that the same strong indicia of fairness is established where an ESOP is fully funded by the employees and where they control the disposition and voting of the ESOP stock. Such an ESOP, as a general rule, would seem to have the elements necessary to commend itself to a wholly independent board of directors. Admittedly, an ESOP structured in this fashion is not necessarily fair, just as a merger price negotiated by an independent committee may not always be upheld.

After considering all of the evidence, including the timing of the ESOP's establishment, its structure and operation, its purposes and likely impact (both as a motivational device and as an anti-takeover device), I am satisfied that the Polaroid ESOP is fundamentally fair. It is essentially stockholder neutral although it does have some dilutive effect. It is structurally fair in its voting and tendering provisions and I

do not find either the timing of its implementation or its possible anti-takeover effect objectionable under the facts of this case. *Cf. Norlin Corp. v. Rooney, Pace Inc.,* 744 F.2d 255, 266 (2d Cir.1984); *Buckhorn, Inc. v. Ropak Corp.,* 656 F.Supp. 209, 231 (S.D. Ohio 1987).

Defendants rushed to put this ESOP in place before Shamrock took any other steps to express its interest in Polaroid. The timing of the meeting, change in allocation provisions and decision to issue treasury shares all had to have been motivated, at least in part, by a desire to add one more obstacle to Shamrock's potential acquisition bid. The fact that the ESOP was partly defensive, however, does not make it unfair. This is a defensive device (assuming it is one) that is designed to and appears likely to add value to the company and all of its stockholders. It does not prevent the stockholders from receiving or considering alternatives. In sum, the plan adopted by the directors, whether adequately considered or not, is fair and should not be invalidated.

### III.

In Count II of its complaint, Shamrock alleges that it is entitled to damages on one of several theories relating to the agreement to have a meeting on July 13 between Disney, Gold and Booth.[19] Shamrock contends that on June 27, 1988 the parties entered into an enforceable oral contract based upon an exchange of promises. Shamrock was promised a meeting with Booth on July 13 and was given a commitment that Polaroid would maintain the "status quo" until the meeting in exchange for Shamrock's promise: (1) not to acquire more than 5% of Polaroid's stock prior to the meeting; (2) not to present any proposals at the meeting that would require public disclosure; and (3) not to purchase any shares for a reasonable period after the meeting. Shamrock argues that this agreement was breached in a variety of ways. First, Shamrock says that the adoption of the ESOP on July 12 violated Polaroid's commitment to maintain the status quo. Alternatively, Shamrock argues that the cancellation of the July 13 meeting constituted a breach of the parties' agreement even if the "status quo" portion of the agreement were deemed unenforceable.

It is undisputed that Shamrock honored its commitment by not only refraining from purchasing additional Polaroid stock but also by repurchasing put contracts in order to avoid inadvertently exceeding 5%. It is also undisputed that Polaroid cancelled the July 13 meeting.[20] Nonetheless, I find that Shamrock is not entitled to recover on its claims.

■ Polaroid's alleged agreement to maintain the status quo, even if established, would be unenforceable. *See United States v. Bedford Assoc.,* 491 F.Supp. 851, 862 (S.D.N.Y.1980) ("if some of the essential terms are too indefinite, there is no contract"); *Brown & Guenther v. North Queensview Homes, Inc.,* 18 A.D.2d 327, 239 N.Y.S.2d 482, 484 (1963) ("Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, may prevent the creation of an enforceable contract.") There is no evidence that the parties had any understanding as to the meaning of the term "status quo" as used in this context. Gold testified that the commitment to maintain the status quo would not have prevented Polaroid from entering into the conventional film market, refocusing its research, settling its litigation with Kodak, or taking steps to make the company more efficient. It is difficult, if not impossible, to provide a

---

**19.** Under Delaware choice of law rules, New York law governs the validity and construction of a contract formed in New York. *Wilmington Trust Co. v. Pennsylvania Co.,* Del.Supr., 172 A.2d 63, 66 (1961). To the extent that there is a contract, the parties agree that it was formed in New York.

**20.** I will not discuss the semantic niceties of Booth's definition of the words "cancelled" and "postponed" inasmuch as it would not alter the result.

standard by which one could determine that the decision to enter into a new product line or to resolve multi-billion dollar litigation does not change the status quo whereas the decision to implement at 14% leveraged ESOP does.

I have no doubt but that Shamrock could have been much more specific in the commitment it required of Polaroid. However, a carefully worded statement of conditions for a "friendly" meeting likely would have resulted in no meeting at all and little or no prospect that the parties would develop a working relationship. In short, I find that any agreement between the parties with respect to Polaroid's obligation to maintain the status quo is *too indefinite to be enforceable.*

■ Shamrock's alternative argument does not suffer the same infirmity. An agreement to meet on July 13 is quite explicit and there is no question but that the meeting did not take place as scheduled. The problem with this theory is that Shamrock has not proved a breach. It is true that the agreement called for a meeting to be held on July 13. From all of the circumstances, it is fair to infer that the agreement also included an implicit understanding that time was of some significance. However, the cancellation of the July 13 meeting because of other business commitments does not constitute a breach of the parties' agreement unless Booth was unable or unwilling to meet with Gold and Disney within a reasonable time after July 13. *See* Restatement (Second) Contracts § 242(c).

Shamrock introduced no evidence that its representatives attempted to reschedule a meeting or that Booth refused to do so. To the contrary, the evidence indicates that, after learning of the events of July 12, 1988, Shamrock was no longer interested in a meeting with Booth. The people at Shamrock viewed Polaroid as having "thrown down the gauntlet" and instructed their attorneys to file suit against Polaroid within days thereafter.

Shamrock also contends that it is entitled to recover damages under a theory of common law fraud. Booth allegedly never intended to meet with Gold and Disney. He is charged with having agreed to a meeting only to induce Shamrock to "standstill" until the scheduled meeting date. In order to prevail, Shamrock must prove, among other things, that Booth knew he would not meet with Gold and Disney at the time he agreed to do so. *See Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc.,* 88 A.D.2d 461, 453 N.Y.S.2d 750, 754–55 (1982); *Orbit Holding Corp. v. Anthony Hotel Corp.,* 121 A.D.2d 311, 503 N.Y.S.2d 780, 782 (1986). While there is evidence to suggest that defendants knew the Shamrock meeting would be cancelled several days before Shamrock was told, there is no evidence that they knew from the outset that the meeting would never be held.

Based upon the foregoing, judgment is entered in favor of the defendants. IT IS SO ORDERED.