SHAMROCK HOLDINGS, INC., Indiana Partners, L.P., Oregon Partners, Shamrock Capital, L.P. and Shamrock Holdings of California, Inc., Plaintiffs,

v.

POLAROID CORPORATION, I. MacAllister Booth, Yen–Tsai Feng, Richard D. Hill, Frank S. Jones, Carl Kaysen, William J. McCune, Jr., Henry Necarsulmer, Kenneth H. Olson, Julius Silver, Charles P. Slichter, Ralph Z. Sorenson, A. Michael Spence and Alfred M. Zeien, Defendants.

In re POLAROID
SHAREHOLDERS LITIGATION.

SHAMROCK HOLDINGS, INC., Shamrock Holdings of California, Inc., Emerald Isle Associates, L.P., Shamrock Capital Investors III, Inc. and Shamrock Acquisition, III, Inc., Plaintiffs,

v.

POLAROID CORPORATION, I. MacAllister Booth, Yen–Tsai Feng, Richard D. Hill, Frank S. Jones, Carl Kaysen, William J. McCune, Jr., Henry Necarsulmer, Kenneth H. Olson, Charles P. Slichter, Ralph Z. Sorenson, A. Michael Spence, Alfred M. Zeien, and Corporate Partners, L.P., Defendants.

George S. KOLBE, As Trustee of George Kolbe Target Benefit Plan, Harold Sachs, Lenore Schlossberg, Natalie Trager and Edward McDaid, Plaintiffs,

v.

POLAROID CORPORATION, I. MacAllister Booth, Yen–Tsai Feng, Richard D. Hill, Frank S. Jones, Carl Kaysen, William J. McCune, Jr., Henry Necarsulmer, Kenneth H. Olson, Julius Silver, Charles P. Slichter, Ralph Z. Sorenson, A. Michael Spence, and Alfred M. Zeien, Defendants.

Civ. A. Nos. 10075, 10079, 10582 and 10585.

Court of Chancery of Delaware,
New Castle County.

Submitted: March 13, 1989.
Decided: March 17, 1989.

A. Gilchrist Sparks, Lawrence A. Hamermesh, Kenneth J. Nachbar, Robert J. Valihura, Jr., and Alan J. Stone of Morris, Nichols, Arsht & Tunnell, Wilmington, and Michael H. Rauch, Debra M. Torres, Pamela Jarvis, William C. Viets, John C. Sullivan, and Douglas H. Flaum of Fried, Frank, Harris, Shriver & Jacobson, New York City, for plaintiffs Shamrock Holdings, Inc., Indiana Partners, L.P., Oregon Partners, Shamrock Capital, L.P., Shamrock Holdings of California, Inc., Emerald Isle Associates, L.P., Shamrock Capital Investors III, Inc. and Shamrock Acquisition, III, Inc.

Joseph A. Rosenthal, and Kevin Gross of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, Jill S. Abrams of Abby & Ellis, Michael P. Fuchs of Wolf Popper Ross Wolf & Jones, New York City, Ronald Litowitz of Bernstein Litowitz Berger & Grossman, New York City, and Curtis V. Trinko, New York City, for Shareholder Litigation plaintiffs and George S. Kolbe, Harold Sachs, Lenore Schlossberg, Natalie Trager and Edward McDaid.

R. Franklin Balotti, Jesse A. Finkelstein, Gregory V. Varallo, C. Stephen Bigler, James C. Strum, Anne C. Foster, and Daniel A. Dreisbach of Richards, Layton & Finger, Wilmington, Frederick A.O. Schwarz, Jr., Robert N. Feltoon, Douglas D. Broadwater, Stuart W. Gold, Rosemary Q. Barry, and Timothy C. Harrison of Cravath, Swaine & Moore, New York City, and Stephen D. Poss of Goodwin, Procter & Hoar, Boston, Mass., for Polaroid Corp. and individual defendants.

Edward B. Maxwell, II, and David C. McBride of Young, Conaway, Stargatt & Taylor, Wilmington, and Herbert M. Wachtell, Kenneth B. Forrest, Andrew Houston, and Ralph Levene of Wachtell, Lipton, Rosen & Katz, New York City for Corporate Partners, L.P.

OPINION

BERGER, Vice–Chancellor

Shamrock Holdings, Inc. and related entities (collectively "Shamrock") have been attempting to acquire Polaroid Corporation ("Polaroid") for the past nine months. The litigation precipitated by this takeover effort began in July, 1988 when Shamrock and Polaroid stockholders filed actions attacking the validity of an employee stock ownership plan ("ESOP") adopted by Polaroid on July 12, 1988. In those cases (collectively "Polaroid I"), which were tried and decided on an expedited basis, this Court upheld the validity of the ESOP, finding that it was fundamentally fair even though it had been adopted and enlarged in part as a defensive measure. *See Shamrock Holdings, Inc. v. Polaroid Corp.*, Del.Ch., 559 A.2d 257 (1989). Plaintiffs sought and obtained expedited scheduling of their appeal to the Delaware Supreme Court and, until recently, the appeal of Polaroid I had been set to be heard on March 16, 1989.

On January 30, 1989, Polaroid announced several steps it was taking or had taken in response to Shamrock's outstanding tender offer. That announcement provoked the current set of complaints by Shamrock and a purported class of Polaroid stockholders (collectively "Polaroid II") against Polaroid, its directors and Corporate Partners, L.P. ("Corporate Partners"), a limited partnership organized by Lazard Frères & Company ("Lazard"). The complaints in Polaroid II challenge the issuance of a convertible preferred stock (the "Preferred Stock") to Corporate Partners as well as a $1.1 billion proposed stock repurchase program. Plaintiffs claim that the announced transactions are unreasonable defensive maneuvers designed to thwart Shamrock's tender offer and to defeat Shamrock in a forthcoming proxy contest. After expedited discovery and briefing, plaintiffs' motions for a preliminary injunction were heard on February 27, 1989.

Shortly after the oral argument, the Delaware Supreme Court asked the parties to evaluate the interrelationship, if any, between the facts and/or legal issues raised

by Polaroid I and Polaroid II. Based on the parties' submissions, the Supreme Court determined that (1) the two cases are interrelated; (2) certain facts in Polaroid II may be relevant to Polaroid I; and (3) this Court "should be afforded the opportunity to ... enlarge the record and to make such further supplemental findings of fact and rulings in [Polaroid I] that appear appropriate...." *In re Polaroid Corporation Shareholders Litigation*, Del.Supr., Horsey, J. (1989) (ORDER) [560 A.2d 491 (table) ]. Accordingly, Polaroid I was remanded and the parties submitted supplemental memoranda to this Court addressing the interrelationship of the two sets of actions. This is the decision on plaintiffs' motions for a preliminary injunction in Polaroid II as well as the decision on remand in Polaroid I.

### I.

Although the facts relating to Shamrock's initial expression of interest in Polaroid and Polaroid's adoption of the ESOP are set forth in the Polaroid I decision, a certain amount of repetition will be necessary in order to understand the issues presented in Polaroid II. The following is a summary of the relevant facts, including any significant additional facts regarding the ESOP that have come to light in Polaroid II.

### A. *The Parties*

Shamrock Holdings, Inc., through its subsidiaries, is involved in a number of investments and businesses including television and radio broadcasting, software, and real estate development. Shamrock is controlled by Roy E. Disney ("Disney") and members of his family. According to information compiled by Polaroid's investment advisers and provided to the Polaroid board at the time the ESOP was adopted, Shamrock does not have a history of making hostile acquisitions, although in the past few years it has profited from significant short-term investments in several companies.

Polaroid is in the business of developing, manufacturing and marketing a variety of products, primarily those related to instant image recording. At the time of Polaroid I, ten of the thirteen members of the Polaroid board were outside directors. Recently, Julius Silver, who was also a vice president, resigned from the Polaroid board and was replaced by Lester Pollack ("Pollack"), one of the principals in Corporate Partners.

For several years before Shamrock surfaced, financial analysts and members of management recognized that Polaroid was vulnerable as a takeover target because, among other things, the company's profits were relatively low, it carried a small amount of debt and it was anticipated that Polaroid would obtain a very substantial damage award against Eastman Kodak Company ("Kodak"). Although Polaroid undoubtedly was vulnerable, it was not without some protection. In 1986, the board adopted a stockholder rights plan containing "flip-in" and "flip-over" provisions. In addition, although the company does not have a staggered board of directors, several provisions limit a dissident stockholder's ability to gain control of the company. Polaroid's charter prohibits stockholder action by written consent. Pursuant to the bylaws, stockholders may not call special meetings and must give written notice of their intention to nominate directors for election ninety days prior to the annual meeting. Finally, the charter authorizes the issuance of "blank check" preferred stock.

Corporate Partners is a recently formed limited partnership managed by two Lazard partners, Pollack and Ali Wambold. According to its promotional literature, Corporate Partners is in the business of helping management block hostile takeovers:

> The fund has been organized to make friendly investments, usually by taking large minority equity positions of approximately 10% to 30% in publicly held companies which could benefit from the presence of a large, supportive shareholder.
>
> \*    \*    \*    \*    \*    \*
>
> The fund will provide two things: (1) an infusion of capital ... and (2) a block of voting securities in the hands of one so-

phisticated entity which will support management and the board of directors.

\* \* \* \* \* \*

Corporate Partners is also able to provide insulation from market operators and hostile acquirors.... PX 6 at 2055–57.[1]

Corporate Partners is attempting to make a limited number of long term investments totaling approximately $1.5 billion. However, prior to its purchase of the Preferred Stock, Corporate Partners had arranged only one other investment, which has yet to be consummated.

### B. Shamrock's Contact with Polaroid and the Creation of the ESOP

By mid-June, 1988, Shamrock had acquired slightly less than 5% of Polaroid's outstanding stock. Disney wrote to I. MacAllister Booth ("Booth"), Polaroid's President and Chief Executive Officer, on June 17, 1988 advising Booth of Shamrock's holdings and requesting a meeting with Polaroid management "to establish the ground work for a good relationship with the company." ESOP PX 73, at 1. After a strategy meeting with representatives of Shearson Lehman Hutton Inc. ("Shearson"), Polaroid's financial adviser, Booth agreed to meet with Shamrock executives and the meeting was scheduled for July 13, 1988.

That meeting was never held. Instead, on July 12, 1988, the Polaroid board adopted a 14% ESOP as part of a "Comprehensive Plan" designed to increase profitability. As noted at the outset, Polaroid I was instituted shortly after the ESOP was adopted. In upholding the ESOP, I found, among other things, that it gives management a leg up in opposing a takeover bid since employee stockholders are more likely to be concerned about job security than the premium that would be credited to their account if they tendered their shares. I noted that a potential acquiror might have to win over the ESOP stockholders in order to succeed in a takeover attempt, but found no evidence that ESOP "support is or

would be impossible to obtain." *Shamrock Holdings, Inc. v. Polaroid Corp., supra* 559 A.2d at 274. The record in Polaroid II indicates that, as of now, Shamrock is not receiving any ESOP support. Indeed, a petition opposing Shamrock's bid has been signed by more than two-thirds of Polaroid's employees and employee representatives have lobbied Congress and state government officials in an effort to "save" Polaroid from Shamrock.

### C. Shamrock's Tender Offer

On September 9, 1988, Shamrock commenced an all cash tender offer for all outstanding shares of Polaroid's common stock at $42 per share. The offer was conditioned, among other things, upon 90% of the outstanding shares being tendered and judicial invalidation of the ESOP. The offer states that Shamrock might waive the ESOP condition if it determines that the condition cannot be satisfied on a timely basis. If the ESOP condition were waived, Shamrock would reduce the offered price to $40 per share for all shares including the ESOP shares. The offer states Shamrock's intent, "as soon as practicable following the consummation of the Offer," to consummate a merger at the same price in cash as is paid pursuant to the offer. PX 138 at 3.

Since September 9, 1988, the tender offer has been extended and amended from time to time. On January 19, 1989, Shamrock issued a Second Supplement to its tender offer in which the offered price was increased to $45 per share for all shares (including the ESOP shares) conditioned, among other things, upon 90% of the outstanding shares being tendered and a final judicial determination of whether the ESOP shares were validly issued. The Second Supplement states that Shamrock intends to amend the offer to $47 per share if, prior to the execution of a merger agreement, there is a final judicial determination that the ESOP shares were not validly issued. In addition, the Second Supplement states Shamrock's intent to extend its offer from

---

1. Citations to documents submitted in Polaroid II are referred to by the PX or DX number.

Citations to trial exhibits introduced at Polaroid I are referred to as ESOP PX or ESOP DX.

time to time at least until the earlier of the final ESOP determination or the 1989 annual meeting. Shamrock goes on to explain that, if the offer has not been consummated by the time of the annual meeting, it intends to seek the election of a slate of directors committed to the sale of the company either to Shamrock or any bona fide third party that offers a higher price.

The amended offer was scheduled to expire on March 15, 1989. On that date, Shamrock issued a press release extending its offer until May 15, 1989. In addition, the press release states that, unless Shamrock obtains relief from the impact of the issuance of the Preferred Stock prior to the time it mails its proxy statement for the annual meeting, Shamrock intends to add, as a condition to its offer, that a merger agreement be entered into with Polaroid.

### D. *Polaroid's Response*

According to a Schedule 14D–9 filed by Polaroid, the board discussed the terms of the original Shamrock offer with its legal and financial advisers at a regularly scheduled meeting on September 13, 1988. On September 19, 1988, the directors unanimously determined that the offer was inadequate and the board:

> reaffirmed its prior determination that in light of the business, financial condition and bright future prospects of the Company, including the status of the pending litigation with Eastman Kodak Company, it would be in the best interest of the Company and its stockholders for the Company to continue as an independent, publicly-owned corporation, and that the sale of the Company would not be appropriate at this time.

Polaroid's Schedule 14D–9, September 20, 1988 at 1. In the same filing, Polaroid explains that, following its rejection of the Shamrock offer, the Polaroid board directed management to determine the feasibility and desirability of several possible transactions including a recapitalization and the issuance of equity securities.

In late September, 1988, Shearson and members of Polaroid's management began contacting Polaroid's primary banks and potential equity investors to explore recapitalization options. Corporate Partners appears to have been one of the first equity investors that was contacted and it promptly provided Booth with literature describing its "friendly" investment strategy. By October, the banks were told to factor into their considerations the possible issuance of preferred stock in the amount of $200 million. According to testimony by representatives of Polaroid and Shearson, the decision to combine equity financing with debt was based upon (i) the concern that a recapitalization financed entirely with debt would leave the company too highly leveraged; and (ii) the understanding that by borrowing a smaller amount Polaroid would be able to secure more flexible financing terms.

Discussions with banks and Corporate Partners continued and progressed through January, 1989. Apparently there were contacts made with other potential equity investors but none went beyond the preliminary stage. The evidence on this point is not very well developed. According to a Shearson representative, discussions with one financial institution broke down because the potential investor wanted a 40% interest in the company and, in another case, the investor was skeptical about Polaroid's business plans.

In any case, the record indicates that Polaroid negotiated at length and vigorously both with the banks and Corporate Partners. The Polaroid board met on several occasions during the time that the recapitalization plans were being explored by management and Shearson. According to the minutes, at the November 1, 1988 regularly scheduled board meeting, the Polaroid directors discussed various courses Polaroid might follow in response to the Shamrock offer, including a recapitalization. Kenneth Tuchman ("Tuchman"), Managing Director of Mergers and Acquisitions at Shearson, reviewed illustrations of various types of recapitalization plans with the board and reported on discussions with potential financing sources.

On December 13, 1988, at its next regularly scheduled meeting, the board again

discussed recapitalization plans. Tuchman noted that the illustrations (which set forth three different size repurchase plans funded by different combinations of cash, debt and equity) "had been designed, in conjunction with management, to allow the Company to meet its long-term business plan, thereby providing value to the long-term shareholders of the Company, while at the same time providing value to short-term shareholders...." PX 53 at 8.

In the course of the board's discussions, there was recognition of the fact that a repurchase program would increase the strength of the ESOP. In addition, Booth suggested that the board consider the issuance of Preferred Stock to Corporate Partners and the directors were advised that such a step would "make it more difficult for Shamrock but should not necessarily block Shamrock's ability to acquire the Company." *Id.* at 16. The board was also advised that "it was impermissible for a corporation to issue voting stock to a third party ally in order to enhance its position in a voting contest, but not impermissible to issue voting stock to an independent investor for a proper business purpose." *Id.* at 17.

A special board meeting was held the following week to again consider a repurchase plan. The board reviewed management's financial projections (which assumed annual sales growth of approximately 10% over historical results and which, if achieved, would place Polaroid near the top of the Fortune 500 companies). The directors also discussed the terms of the Preferred Stock, including the mechanics involved in setting the conversion price and coupon price and the advantages and disadvantages of issuing Preferred Stock to Corporate Partners.

The next special board meeting was set to occur on January 24, 1989 and Shearson had prepared to assist the board at the meeting in deciding whether to proceed with the Corporate Partners transaction and the stock repurchase plan. Instead, the directors spent most of their time on January 24 considering the amended tender offer announced by Shamrock a few days earlier. Shearson presented a financial evaluation of the Shamrock amended offer, concluding that it was inadequate. Shearson's opinion was based, in part, on the management projections presented at the December 20, 1988 board meeting and on a $1.2 billion estimated value of the Kodak recovery (derived from estimates made by financial analysts in public reports).

Following discussion of the Shearson presentation, the Polaroid board unanimously resolved that the Shamrock amended offer was inadequate and again expressed the view that the company should not be sold at this time. The directors then turned to the Preferred Stock sale and self-tender, reviewing information on the status of bank negotiations and the terms of the Preferred Stock. The minutes indicate that Corporate Partners was expecting a decision at the end of the January 24 board meeting and that, although it was told that there would be a delay as a result of Shamrock's amended offer, Corporate Partners still expected a prompt response.

In a nine hour special meeting held on January 29, 1989, the Polaroid board met and approved the sale of $300 million in Preferred Stock to Corporate Partners and the $1.1 billion stock repurchase plan, subject to approval of a definitive program. During the course of the meeting, the following terms of the Preferred Stock were discussed:

1. *Stock/Warrants*—In exchange for $300 million [2] Corporate Partners was to be issued $100 million of Series B Cumulative Convertible Preferred Stock with annual cumulative cash dividends at 11%; $200 million of Series C Cumulative Convertible Pay–in–Kind Preferred Stock with annual cumulative pay-in-kind dividends at 11.5%; and warrants for 635,000 shares of common stock exercisable at $50 per share.

2. Corporate Partners actually invested only $253 million of the $300 million. Two other entities, not named as defendants, invested the balance—Corporate Offshore Partners, L.P., a limited partnership organized by Lazard for non-United States investors and the State Board of Administration of Florida.

2. *Maturity*—The Preferred Stock has a ten year term. At maturity, if not previously converted or called, it is redeemable at par with Polaroid having the option either to redeem for cash or for Polaroid common stock at 90% of the market price.

3. *Conversion Price*—The conversion price for both the Series B and Series C Preferred Stock is $50 per share.

4. *Voting*—The preferred shares have the right to vote together with holders of Polaroid common stock as a single class. There is no agreement as to how Corporate Partners will vote its stock unless, by virtue of the PIK dividends, Corporate Partners' voting power reaches 20% of the total votes, in which case all votes in excess of 19.9% must be voted, at Corporate Partners' option, either in proportion to the votes of other securities or as directed by Polaroid's board.

5. *Call Provisions*—Both classes of Preferred Stock are callable at Polaroid's option in seven years in cash at par. Polaroid has the option of requiring early redemption in the event of a final judicial determination or settlement of the Kodak litigation. This option is exercisable at the later of (a) January 29, 1992, or (b) the payment of (or agreement to pay) the proceeds of the Kodak litigation.

6. *Change of Control and Flip–Over Provisions*—In the event of a change in control of Polaroid, Corporate Partners is entitled to "put" its Preferred Stock to Polaroid. If the change of control occurs during the first two years of the investment, Corporate Partners will receive a 28–30% rate of return. Should Shamrock acquire Polaroid before July 30, 1989, however, Corporate Partners will be entitled to put its shares at a price of only 107% of par. The Preferred Stock also contains a flip-over provision which entitles Corporate Partners, if Polaroid is merged into another company, to obtain common stock of the acquiring company. This provision does not apply if the acquisition is by a private company, such as Shamrock.

7. *Standstill Provisions*—Corporate Partners is restricted in its ability to transfer its shares to a third party. Corporate Partners is not restricted, however, from tendering into the Shamrock offer or any other cash tender offer for all shares.

The Polaroid directors, with input from their legal and financial advisers, apparently considered both the Preferred Stock issuance and the repurchase plan in depth. They discussed the Shamrock offer and the several reasons why they considered it a threat to Polaroid's corporate policy and effectiveness—the inadequate price; the highly conditional financing; the amount of leverage; Polaroid's bright future prospects; and the prospect that a takeover by Shamrock might jeopardize the Kodak litigation (either because Shamrock would be forced to settle the litigation for less than full value or because Shamrock, not being viewed as the "victim" of the patent infringement, would be given a lower award than would Polaroid).

The directors were presented with and considered Shearson's opinion "that the terms of the Securities and the consideration to be received by the Company in the sale of the Securities are fair, from a financial point of view, to the Company." PX 65 at 639–40. In addition, the directors were advised as to their fiduciary duties and their responsibilities in responding to a takeover bid. The directors were told that it would be unlawful to approve any part of the repurchase plan if their purpose was to manipulate the outcome of an election contest. The directors also discussed the fact that Corporate Partners would be given two seats on the board.

There was extended discussion of the repurchase plan and the benefits it would provide to all of Polaroid's stockholders. At the conclusion of the meeting, the Polaroid directors unanimously approved the repurchase plan, including the issuance of the Preferred Stock to Corporate Partners.

The Preferred Stock transaction was consummated on January 30, 1989 and on February 20, 1989 after bank financing had been arranged, the Polaroid directors ap-

proved an $800 million self-tender for up to 16 million shares of common stock at $50 per share. The offer is set to close on March 20, 1989. Thereafter, Polaroid intends to repurchase an additional $325 million of shares in the open market or in privately negotiated transactions (the "buyback"). However, Polaroid's offer to purchase indicates that there is no assurance as to the timing or terms of the buyback and that Polaroid does not intend to undertake the buyback until there is a judicial determination of the validity of the issuance of the Preferred Stock.

## II.

In Polaroid I, defendant directors contested plaintiffs' argument that the validity of the ESOP should be determined by applying the proportionality test articulated in *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985). When the ESOP was adopted on July 12, 1988, Shamrock had revealed its substantial holdings in Polaroid and requested a friendly meeting, but had not made an acquisition proposal to the board or commenced its tender offer. In Polaroid II, defendant directors acknowledge that the transactions under attack—the issuance of $300 million of convertible preferred stock to Corporate Partners; the $800 million self-tender; and the $325 million post-tender buyback (collectively the "Management Transactions")—were undertaken as a response to Shamrock's takeover bid. Accordingly, they now embrace *Unocal* as the appropriate standard by which their decisions should be measured. However, plaintiffs now argue that an even higher standard is applicable.

## A.

On January 19, 1989, more than a week before Polaroid disclosed its repurchase plan, Shamrock announced its intention to wage a proxy fight to replace the entire Polaroid board at the upcoming annual meeting. On the premise that the Management Transactions were undertaken for the purpose of interfering with the electoral process, plaintiffs argue that those transactions must be invalidated un-

less defendant directors are able to establish "compelling justification" or "extreme circumstances." *Blasius Indus. v. Atlas Corp.*, Del.Ch., Civil Action No. 9720, Allen, C., 1988 WL 81169 (July 25, 1988) slip op. at 28, 31, n. 5. From their arguments, it appears that plaintiffs read *Blasius* as carving out an exception to *Unocal* where the defensive mechanism is designed to interfere with a stockholder vote. For the reasons that follow, I do not believe that *Blasius* should be so construed. In any event, *Blasius* is distinguishable because I am unable to find, on the present record, that the primary purpose of the Management Transactions was to interfere with a stockholder vote.

In *Blasius*, the directors responded to a consent solicitation by enlarging the size of their staggered board, thereby making it impossible for plaintiff to gain control of the board even if supported by a majority of the company's stockholders. The Court found that the directors were acting in good faith—to protect the company and its stockholders from what they believed to be an unwise and potentially harmful recapitalization proposed by plaintiff—and not to retain their offices for selfish purposes. Nonetheless, having found that the defendants' primary purpose was to interfere with the effectiveness of a stockholder vote, the Court held them to the "heavy burden of demonstrating a compelling justification for [their] action." *Id.* at 28.

After reviewing the special importance of stockholder voting rights, as recognized by the Delaware courts, the *Blasius* court analyzed the justification for defendants' action and found it wanting:

> The board was not faced with a coercive action taken by a powerful shareholder against the interests of a distinct shareholder constituency (such as a public minority). It was presented with a consent solicitation by a 9% shareholder. Moreover, here it had time (and understood that it had time) to inform the shareholders of its views on the merits of the proposal subject to stockholder vote. The only justification that can, in such a situation, be offered for the action taken

is that the board knows better than do the shareholders what is in the corporation's best interests. While that premise is no doubt true for any number of matters, it is irrelevant ... when the question is who should comprise the board of directors.

*Id.* at 32. The foregoing suggests that, although the Court did not use the *Unocal* rubric, it performed exactly the sort of balancing contemplated by the Supreme Court. In responding to the non-threat of an informed election of directors, the decision to foreclose the election was found to be unreasonable and, therefore, invalid. As I read *Blasius*, the "heavy burden" imposed upon defendants was not a new standard apart from *Unocal*. Rather, it was a specific expression of the proportionality test as applied to conduct that effectively precluded the election of directors.

■ Even if some higher level of review is required in cases where defendants' primary purpose is to interfere with the electoral process, such a standard would not appear to be applicable in this case. This Court made the "primary purpose" finding in *Blasius* largely because of the timing of defendants' actions and their preclusive effect. The board held an emergency meeting at which it added two new members immediately upon learning that plaintiff was undertaking a consent solicitation to expand and thereby take control of the board. The directors recognized that, by their action, plaintiff's consent solicitation would be nullified and the Court, after trial, did not accept their purported business purpose for expanding the board.

The Management Transactions, by contrast, are not preclusive. Assuming a "worst case" scenario,[3] upon completion of the Management Transactions defendant directors will be assured 33.4% of the vote at the annual meeting. Because of the "roll-up" resulting from the self-tender and stock buyback, Shamrock will own 9.6% of the voting shares leaving 57% "uncommitted." I accept the affidavit evidence that it

is most difficult for an insurgent to out poll management by a factor of 4 to 1. However, it appears that at least 22% of Polaroid's outstanding stock is held by arbitrageurs and other "short term" investors. They, like the ESOP, could increase their proportionate share if they use the proceeds from the self-tender to purchase additional stock. Thus, there is some basis for Polaroid's contention that, even under the "worst case" scenario, Shamrock will be going into the proxy contest with about the same percentage of likely votes as will Polaroid. The effect of the Management Transactions, therefore, does not provide strong evidence of a primary purpose to interfere with the election.

The timing, likewise, is much less suspicious here than it was in *Blasius*. The record at this point indicates that the Management Transactions were being considered, reviewed and, in the case of the Preferred Stock issuance, negotiated, for several weeks, if not months, before Shamrock announced the proxy contest. Defendant directors were aware of the possibility of a proxy fight early on and it appears that their deliberations and their advisers took that possibility into account. However, the present record indicates that the Polaroid directors were focusing more on ways to defeat Shamrock in the market place than upon a means to defeat it at the polls.

## B.

■ If, as I have found, the Management Transactions are not to be tested against the *Blasius* "standard," plaintiffs agree that *Unocal* should be applied. There, the Supreme Court reaffirmed earlier decisions holding that the business judgment rule is available to directors acting in response to a takeover threat. However, because of the "omnipresent specter that a board may be acting primarily in its own interests," two requirements must be satisfied before the business judgment rule will be applied. *Unocal Corp. v. Mesa Petrole-*

---

**3.** *See* Mensch Supp.Aff. ¶ 7. His analysis assumes that the ESOP shares are tendered to Polaroid and the proceeds are reinvested at

$32.50 per share and that Polaroid undertakes the selective buyback at the same price.

*um Co.*, 493 A.2d at 954. The directors must establish "reasonable grounds for believing that a danger to corporate policy and effectiveness existed because of another person's stock ownership" and the defensive measure chosen by the board must be "reasonable in relation to the threat posed." *Id.* at 955. In discussing the possible "threats" presented by a hostile takeover bid, the Supreme Court stated:

> If a defensive measure is to come within the ambit of the business judgment rule, it must be reasonable in relation to the threat posed. This entails an analysis by the directors of the nature of the takeover bid and its effect on the corporate enterprise. Examples of such concerns may include: inadequacy of the price offered, nature and timing of the offer, questions of illegality, the impact on "constituencies" other than shareholders (i.e., creditors, customers, employees, and perhaps even the community generally), the risk of nonconsummation, and the quality of securities being offered in the exchange. [Citation omitted]. While not a controlling factor, it also seems to us that a board may reasonably consider the basic stockholder interests at stake, including those of short term speculators, whose actions may have fueled the coercive aspect of the offer at the expense of the long term investor.

*Id.* at 955–56.

The record adequately establishes that the Polaroid directors acted in good faith and reasonably investigated Shamrock's offer. The board met on at least six occasions over a four month period to review Shamrock's original and amended offer and to discuss appropriate responses with management as well as its financial and legal advisers. Only two of Polaroid's thirteen board members are present or former officers of the company and there is no evidence from which the Court could make a preliminary finding that the outside directors were seeking to entrench themselves.

The second prong of *Unocal* is the proportionality test under which Polaroid's response must be balanced against the Shamrock threat. Plaintiffs suggest that this is a simple exercise. Shamrock's all cash, all shares offer is non-coercive and, therefore, a non-threat. Polaroid's response is a coercive self-tender that will increase the blocking power of the ESOP and Corporate Partners. According to plaintiffs, this response threatens to deprive the stockholders not only of Shamrock's premium offer, but also all future acquisition bids.

Plaintiffs' argument may be summarized as follows. Shamrock's current offer is for $45 per share in cash for all outstanding shares. It includes a commitment to promptly pay the same price in cash in a second-step merger. Thus, the offer is structurally non-coercive and may be considered a "threat" only to the extent that the offered price may be deemed inadequate. In the face of such a minimal threat (assuming it is appropriate to consider an inadequate non-coercive offer a threat at all) arguably the only reasonable responses would be for Polaroid to (1) inform the stockholders that they should retain their stock; and/or (2) offer an alternative and allow the stockholders to make their choice.[4] *Cf. AC Acquisitions Corp. v. Anderson, Clayton & Co.*, Del.Ch., 519 A.2d 103 (1986).

The Polaroid self-tender, although appearing to offer the stockholders a choice, in fact threatens to preclude the Shamrock offer, according to plaintiffs. Unless this Court requires Polaroid to extend the closing date, the self-tender will be consummated before the Shamrock offer.[5] Since

---

**4.** The parties agree that Shamrock's proxy contest does not, of itself, constitute any cognizable threat.

**5.** The self-tender is set to expire on March 20, 1989. Shamrock maintains that, unless the Preferred Stock issuance is invalidated, its tender offer cannot expire before Polaroid's next annual meeting (which, according to the bylaws, should be held on May 9, 1989). This is so because Shamrock is only willing to proceed with its tender offer if it will be able to follow the tender offer with a merger. Now that the Preferred Stock has been issued to Corporate Partners, it will be impossible for Shamrock to accomplish a short-form merger even if it were able to acquire 100% of the common stock through its tender offer. *See* 8 *Del. C.* § 253.

the self-tender is at $50 per share and the after-market trading price is anticipated to be less than the current market price (of approximately $41 per share), Polaroid's stockholders are virtually forced to tender to the company in order to protect the value of their "stub" shares. Following the self-tender and stock buyback, plaintiffs project that the ESOP and Corporate Partners will control approximately 33% of the voting shares. With such a significant block of stock virtually assured of voting against Shamrock in the proxy contest, plaintiffs contend that Shamrock's chances of success are significantly decreased.[6] The likely net result is that Shamrock's offer will be precluded even if a majority of the present Polaroid stockholders prefer the Shamrock offer.

The Polaroid directors, naturally, claim that the threat is significantly more serious and the response more moderate. With respect to the inadequacy of the Shamrock offer price, the Polaroid directors point out that neither Shamrock nor its financial advisers have ever represented that $45 is adequate or fair. Shamrock's offer is also considered a threat because, in the board's view, it does not offer full value for the Kodak judgment. That judgment is, by far, Polaroid's most valuable asset. The directors fear that Shamrock will either exploit or impair that asset:

(a) ... Shamrock may undervalue the award because of its uncertainty and Shamrock's lesser knowledge of the full merits of Polaroid's claim; (b) ... because of Shamrock's need to pay down its acquisition debt promptly, Shamrock may be willing to quickly settle the litigation for less than full value; and (c) ... the court in the Kodak action may be

Since board approval is required for a merger pursuant to 8 *Del. C.* § 251, Shamrock claims that its only remaining alternative is to replace the Polaroid board and then enter into a merger agreement with the new board. In order to replace the current Polaroid board, Shamrock must await the annual meeting because Polaroid stockholders are not permitted to call special meetings and they are not allowed to take action by written consent.

inclined to award less damages to a takeover acquiror than to the original victim. Kaysen Aff. ¶ 20. Other threats articulated by the Polaroid board include: opportunistic timing (based upon Polaroid's view that it is on the verge of realizing significantly greater earnings and growth than in recent past); the fact that the offer is very highly leveraged (which, according to the Polaroid directors means that Shamrock may be pressured into raising cash quickly at the expense of Polaroid's long-term welfare); and the "highly conditional" nature of the offer (which creates a serious risk of nonconsummation).

The Polaroid directors characterize their response as being measured and quite mild. None of the Management Transactions, viewed individually or collectively, will preclude the successful completion of Shamrock's tender offer. The Preferred Stock issuance may complicate Shamrock's financing and add to the overall acquisition costs (because of the change of control premium that would be payable to Corporate Partners). However, the Corporate Partners stock was issued on commercially reasonable terms for the valid purpose of obtaining a portion of the funds needed to implement the repurchase program. That program, in turn, is justified as a way of addressing the needs of long-term and short-term investors:

The objective of the Repurchase Plan is to deliver directly to stockholders a portion of the Company's current value while enhancing the Company's prospects for future growth in stockholder value. The Offer is intended to provide the Company's stockholders with a means of furthering their investment objectives with respect to the Shares. The Offer provides the stockholders who

6. In addition to the obstacle that a 33% voting block creates, plaintiffs complain that there is also a significant "perception" problem. To the extent that stockholders wish to elect Shamrock's slate of directors, but believe that Shamrock has no chance of winning, there is a reasonable likelihood that the stockholders will not vote at all. This "chilling effect" of the realignment of shares following the Management Transactions renders those transactions all the more unreasonable, according to plaintiffs.

wish to realize a portion of their investment currently in cash with an opportunity to sell a portion of their Shares at a premium over recent market prices of the Shares. The Offer also is intended to provide long-term stockholders with an opportunity to increase their proportionate ownership interest in the Company either by not participating in the Offer or by participating in the Offer and reinvesting their after-tax proceeds in additional Shares. The Company has also evaluated and approved the Repurchase Plan, including the Offer, as a partial response to the Shamrock Offer, which the Company has rejected.

Polaroid Offer to Purchase at 4.

According to Polaroid, the timing of the self-tender creates no added problem for Shamrock. After the self-tender, control of Polaroid will remain in the hands of the public stockholders, who will be free to tender to Shamrock and vote for its nominees. The fact that more than 30% of the voting shares will, at that point, be in "friendly" hands is down played as an incidental impact of an eminently reasonable takeover response.

### C.

It is difficult to understand how, as a general matter, an inadequate all cash, all shares tender offer, with a back end commitment at the same price in cash, can be considered a continuing threat under *Unocal.* Certainly an inadequate coercive tender offer threatens injury to the stockholders. *See, e.g., Unocal Corp. v. Mesa Petroleum Co., supra; Ivanhoe Partners v. Newmont Mining Corp.,* Del.Supr., 535 A.2d 1334 (1987). An inadequate, non-coercive offer may also constitute a threat for some reasonable period of time after it is announced. The target corporation (or other potential bidders) may be inclined to provide the stockholders with a more attractive alternative, but may need some additional time to formulate and present that option. During the interim, the threat is that the stockholders might choose the inadequate tender offer only because the superior option has not yet been presented.

*See, e.g., Facet Enterprises, Inc. v. Prospect Group, Inc.,* Del. Ch., Civil Action No. 9746, Jacobs, V.C., 1988 WL 36140 (April 15, 1988); *Nomad Acquisition Corp. v. Damon Corp.,* Del. Ch., Civil Action No. 10,173, Hartnett, V.C., 1988 WL 96192 (September 16, 1988) (where this Court held it appropriate to keep a "poison pill" in place in order to conduct an auction); *City Capital Assoc., L.P. v. Interco Inc.,* Del. Ch., 551 A.2d 787, 798 (1988), *appeal dismissed,* Del.Supr., 556 A.2d 1070 (1988) (same holding with respect to target corporation's plan to develop an "alternative.") However, where there has been sufficient time for any alternative to be developed and presented and for the target corporation to inform its stockholders of the benefits of retaining their equity position, the "threat" to the stockholders of an inadequate, non-coercive offer seems, in most circumstances, to be without substance.

While I am skeptical about the general proposition that a non-coercive inadequate tender offer constitutes a cognizable threat, the unusual circumstances of this case appear to justify some level of defensive response. Polaroid is about to begin trial of the damages portion of its patent infringement litigation against Kodak. That action was commenced in 1976, almost immediately after Kodak introduced its instant cameras and film, and Polaroid obtained a judgment in its favor in 1985. Appeals of that judgment and other related issues have been underway at various times over the past three years and the damages trial is scheduled to begin in April. Polaroid is seeking approximately $5.7 billion in damages and, based upon the table included in Polaroid's Offer to Purchase, the after-tax proceeds of a recovery in the amount of $5.6 billion paid two years from now will be $44.14 per share. Even a recovery of "only" $1.2 billion or $9.46 per share constitutes more than 20% of Polaroid's present market value.

Polaroid includes a fairly lengthy description of the Kodak litigation in its Offer to Purchase as well as a variety of mathematical calculations for potential recoveries ranging from $400 million to $6.4 billion. However, the company specifically dis-

claims making any representation as to the likely amount of any recovery or when such a recovery may be obtained. Polaroid's officers, directors and advisers may have opinions on both of those subjects, but the facts will not be known until the Kodak litigation runs its course. Moreover, if defendants' assessments of the value of the Kodak litigation were disclosed, Polaroid's bargaining position with Kodak could be seriously weakened.

■ In sum, Polaroid is anticipating a monetary recovery that may exceed $5 billion as the result of a complicated patent infringement claim that spans more than a decade. In the foreseeable future, the amount of the damage award will be quantified if not paid. Until that time, it seems appropriate to consider a non-coercive but inadequate tender offer to be a threat. Although the stock market has "valued" the Kodak judgment and analysts have made estimates, Polaroid's stockholders really have very little way of assessing the present worth of this extremely valuable asset. Under these circumstances, there is a real possibility that the Polaroid stockholders will undervalue the Kodak judgment and it does not appear that the mere dissemination of information will cure this problem. Thus, I am satisfied that the Polaroid directors were entitled to treat the Shamrock tender offer as a threat. There is evidence that the offered price is inadequate (and the board so found) and there is a valid basis for concern that the Polaroid stockholders will be unable to reach an accurate judgment as to intrinsic value of their stock in light of the current status of the Kodak litigation.

The issue then becomes whether the Management Transactions constitute a reasonable response to the threat presented by this arguably inadequate bid. The purported purpose of the self-tender and buyback is to offer some immediate value to those stockholders interested in cash while increasing the equity interest held by the remaining stockholders. The Preferred Stock issuance is said to be an advantageous form of financing for the repurchase program.

If viewed in isolation, it would be difficult to find that the self-tender and buyback constitute an unreasonable response to Shamrock. As noted earlier, neither the timing of the repurchase plan nor the resulting shifts in the stockholder profile appears to prevent Shamrock's offer from succeeding. Ignoring Corporate Partners and the ESOP for the moment, the likely shift in the stockholder profile in favor of Polaroid appears to be minimal and the concept of a self-tender that allows the stockholders to choose between it and a hostile bid has been expressly endorsed as an appropriate response to an unsolicited offer that is found to be inadequate. *See AC Acquisitions Corp. v. Anderson, Clayton & Co.*, 519 A.2d at 112.

The repurchase plan takes on a more sinister aspect, according to plaintiffs, when viewed in context. As noted earlier, the self-tender is likely to increase the combined voting power of the ESOP and Corporate Partners above 30% and the post-tender selective buyback undoubtedly will be used to reduce the holdings of those Polaroid stockholders identified by management as "short-term" investors. One of the results of the Management Transactions, therefore, is likely to be that significantly more voting power will be in the hands of groups that oppose Shamrock.

It seems appropriate to carefully scrutinize the purported justifications for transactions that clearly impact on the electoral process. As noted earlier, I am unprepared to find that the repurchase plan was designed to interfere with a fair election. Rather, the roll up effect of the self-tender and selective buyback appear to be an incidental part of a repurchase plan that was designed as a response to Shamrock's tender offer. *Cf. Moran v. Household Intern., Inc.*, Del.Ch., 490 A.2d 1059, 1080, *aff'd*, Del.Supr., 500 A.2d 1346 (1985). Factoring in the ESOP vote does not alter my preliminary view. I remain unpersuaded that the employee stockholders constitute a monolithic block of voters who, for one reason or another, are constrained to vote with management. Their apparently strong opposition to Shamrock is more like-

ly attributable to distrust of its plans and displeasure with the price offered than to any undying devotion to management. In short, the ESOP votes do not, in my view, taint the election.

I have some difficulty making the same statement with respect to Corporate Partners. It seems a bit too convenient that, after seeking out a dozen potential equity investors, the only entity willing to invest on terms acceptable to Polaroid was one that promotes itself as a "friendly" investor that provides "insulation from . . . hostile acquirors" and "take[s] the company out of play. . . ." There is evidence that the terms of the preferred stock are commercially unreasonable and the dialogue about voting at the annual meeting raises more questions than it answers.[7] Defendants offer this evidence to demonstrate their good faith and independence. However, there are many ways that a question can be asked so as to assure the desired answer. Assuming that the request was bona fide, why didn't Polaroid reconsider the Corporate Partners·transaction in light of the voting problem? And why did Corporate Partners refuse Polaroid's bona fide request if Polaroid really wanted this limited concession and Corporate Partners' investment philosophy is to be a supportive and adaptable financial partner?

These questions, of course, are based upon a very limited record which also includes credible evidence that: (1) during the course of fairly extensive arms-length negotiations, Polaroid was able to *reduce* the number of votes Corporate Partners would be given; (2) the terms of the Preferred Stock *are* commercially reasonable; and (3) the Preferred Stock allows Polaroid significantly more flexibility than it would have had if the $300 million paid by Corporate Partners had been obtained through corporate borrowing. In sum, although I am not entirely satisfied that the issuance of the Preferred Stock was simply a financing device, I am unable to conclude preliminarily that either the Corporate Partners transaction alone or the Management

Transactions as a whole are unreasonable either because they are disproportionate to the Shamrock threat or because they were improperly motivated.

Based upon the foregoing, plaintiffs' motions for a preliminary injunction are denied for failure to establish a likelihood of success on the merits.

### III.

The remaining issues are those raised by the Supreme Court in its remand of Polaroid I. I have reconsidered my original decision in light of the evidence presented in Polaroid II and the supplemental submissions of the parties. With the exception of one factual matter, discussed hereafter, I am not persuaded that the decision in Polaroid I should be revised in any way as a result of subsequent events.

The fact that the ESOP has confidential tendering provisions was a significant element in this Court's conclusion that the ESOP is fundamentally fair. Although the parties' attention was focused on tendering provisions at that time, the Court labored under the misunderstanding that the ESOP plan document also provided for confidential voting. The evidence indicates that Polaroid's directors understood there to be confidential voting and there is also a letter from the trustee (which predates Shamrock's announcement of a proxy contest) indicating that the trustee will keep the ESOP stockholders' votes in confidence. After the Court sought clarification of this point and Polaroid confirmed that the plan document did not require confidential voting, the Polaroid directors amended the ESOP at a special meeting held on March 15, 1989. As a result of that amendment, the ESOP now does require confidential voting.

In light of the evidence that both the Polaroid directors and the ESOP trustee were treating the ESOP as if it required confidential voting even before being challenged on this point and in light of the fact

---

**7.** After Shamrock announced its intent to wage a proxy contest, Polaroid representatives requested that Corporate Partners not vote its

stock (which had not then been issued) at the annual meeting. Corporate Partners refused.

that the plan document has now been amended to require confidential voting, I am satisfied that no new conclusions of law are necessary or appropriate in Polaroid I. IT IS SO ORDERED.